1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16
17
18
19
20
21

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY AND WESTLANDS WATER DISTRICT,<br><br>                    Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>                    Defendants. | 1:97-CV-6140 OWW DLB<br>1:98-CV-5261 OWW DLB<br><br>MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT RE (B)(2) ACCOUNTING FOR 2004 (B)(2) ACCOUNTING YEAR |
| SAVE SAN FRANCISCO BAY Assoc., *et al.*,<br><br>                    Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>                    Defendants. | |

22
23
24
25
26
27
28

I.  <u>INTRODUCTION</u>

Before the court for decision are the November 19, 2007 cross-motions for summary judgment on all claims raised by the supplemental complaint of San Luis & Delta-Mendota Water Authority ("Authority") and Westlands Water District ("Westlands")(collectively, "Plaintiffs").  (Docs. 680 & 685.)

1

1   The supplemental complaint raises an as-applied challenge to the
2   manner by which two branches of the Department of the Interior,
3   the U.S. Bureau of Reclamation ("Bureau") and the U.S. Fish and
4   Wildlife Service ("FWS") (collectively, "Federal Defendants" or
5   "Interior"), implemented accounting procedures pursuant to
6   Section 3406(b)(2) ("Section (b)(2)" or "(b)(2)") of the Central
7   Valley Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat.
8   470o, 4714 (1992), during the 2004 (b)(2) accounting year.  (Doc.
9   646.)

10      Specifically, Plaintiffs allege that Federal Defendants
11  acted unlawfully by not crediting certain uses of CVP water
12  during the 2004 water year toward the statutory mandate, set
13  forth in Section 3406(b)(2), to allocate 800,000 acre-foot ("AF")
14  of CVP yield to certain purposes, including fish, wildlife, and
15  habitat restoration goals.

16      Plaintiffs assert there are no material facts in dispute and
17  that the Federal Defendants acted unlawfully in implementing CVP
18  accounting procedures during 2004.  (Doc. 686.)  Federal
19  Defendants argue that Plaintiffs lack standing, their claims are
20  moot, and, in the alternative, that the Bureau acted lawfully,
21  within the bounds of its discretion.  (Doc. 685-3.)
22  Environmental Plaintiffs in the consolidated action, *Save San
23  Francisco Bay Assoc., et al., v. U.S. Department of Interior, et
24  al.*, 1:98-CV-6140 OWW DLB, oppose Plaintiffs' motion, providing
25  additional legal argument regarding the extent of the Bureau's
26  discretion to refrain from counting certain types of water uses
27  against the 800,000 AF allocation.  (Doc. 690, filed Jan. 7,
28  2008.)

2

1

## II.   BACKGROUND

2

A.   Statutory Text.

3

The dispute concerns the statutory text of CVPIA section

4

3406(b)(2):

5

> (b) FISH AND WILDLIFE RESTORATION ACTIVITIES.--The
> Secretary [of the Interior], immediately upon the
6
> enactment of this title, shall operate the Central
> Valley Project to meet all obligations under state and
7
> Federal law, including but not limited to the Federal
> Endangered Species Act, 16 U.S.C. 1531, *et seq.*, and
8
> all decisions of the California State Water Resources
> Control Board establishing conditions on applicable
9
> licenses and permits for the project.  The Secretary,
> in consultation with other State and Federal agencies,
10
> Indian tribes, and affected interest, is further
> authorized and directed to:

11
> ***
12
> (2) upon enactment of this title dedicate and
> manage annually eight hundred thousand acre-feet
13
> of Central Valley Project yield for the primary
> purpose of implementing the fish, wildlife, and
14
> habitat restoration purposes and measures
> authorized by this title; to assist the State of
15
> California in its efforts to protect the waters of
> the San Francisco Bay/Sacramento-San Joaquin
16
> Estuary; and to help meet such obligations as may
> be legally imposed upon the Central Valley Project
17
> under state or federal law following the date of
> enactment of this title, including but not limited
18
> to additional obligations under the federal
> Endangered Species Act....

19

Pub. L. No. 102-575, § 3406(b)(2), 106 Stat. 4700, 4714 (1992).

20

B.   District Court and Ninth Circuit Rulings.

21

This (b)(2) language has been the subject of a series of

22

protracted lawsuits, culminating in orders in these consolidated

23

cases at the district and appellate court levels.  As those

24

decisions comprehensively recount this history, only a brief

25

recap is necessary.

26

The CVPIA took effect October 31, 1992.  In 1998, Plaintiffs

27

challenged Federal Defendants' October 5, 1999 "Final Decision on

28

3

1   Implementation of Section 3406(b)(2)...," contending that Federal

2   Defendants were required to credit against the 800,000 AF

3   allocation of CVP yield all water used to satisfy either the 1995

4   Water Quality Control Program ("WQCP") or post-CVPIA Endangered

5   Species Act ("ESA") requirements. (*See* Doc. 466 at 26.)  The

6   district court granted Plaintiffs' motion for summary judgment,

7   concluding: "[As] a matter of law, [the statutory] language is

8   not ambiguous -- water used to meet WQCP or post-CVPIA ESA

9   requirements is an additional (b)(2) purpose and must be charged

10  against the 800 TAF [thousand acre-feet] (b)(2) mandate if so

11  used."  (*Id*. at 33.)  The district court further found that to

12  "hold otherwise would render the 800 TAF figure superfluous."

13  (*Id*. at 35.)  On March 20, 2002, partial final judgment was

14  entered in favor of Plaintiffs on that claim and the issue was

15  certified for interlocutory appeal to the Ninth Circuit.  (Doc.

16  491 at 4.)

17       On appeal, Environmental Plaintiffs argued that the district

18  court's judgment "improperly elevated the subordinate purpose of

19  the (b)(2) dedication over the primary purpose."  (Envt'l

20  Appellants' Opening Brief, 2002 WL 32123196 *36 (9th Cir. Dec.

21  23, 2002).)  In response, Plaintiffs argued that "the plain words

22  of the statute dictate and Congress intended that all water used

23  to assist the State in protection of the Bay/Delta, or to meet

24  obligations (including ESA obligations) legally imposed upon the

25  CVP under State or Federal law following the date of enactment of

26  CVPIA, would be counted toward the 800,000 acre-feet limit."

27  (Appellants' Brief in Answer to Envt'l Appellants' Opening Brief,

28  2003 WL 21471613 *27, (9th Cir. Jan. 30, 2003).)  In reply,

**4**

1  Environmental Plaintiffs emphasized that "the CVPIA cannot defeat

2  the statute's specific and non-discretionary directions to

3  Interior to use the 800,000 AF for the 'primary purpose' of

4  implementing the CVPIA's new restoration measures, and to achieve

5  the CVPIA's salmon doubling mandate."  (Envt'l Appellants' Reply

6  Brief, 2003 WL 21471615 *13 (9th Cir. Feb. 18, 2003).)

7       The Ninth Circuit, in a ruling initially issued June 3, 2003

8  and amended January 23, 2004, affirmed the district court's

9  partial final judgment on four points, but reversed with respect

10 to the holding regarding (b)(2) accounting:

11              The district court erred in concluding that Interior
               lacks discretion to refrain from crediting the amount
12             of Project yield actually used for any (b)(2) purpose
               against the designated 800,000 acre feet of Project
13             yield. To hold otherwise would defeat the primary
               purpose for which the 800,000 acre feet were
14             designated-fish, wildlife, and habitat restoration.
               Section 3406(b)(2) provides that the "primary purpose"
15             to which the 800,000 acre feet should be dedicated is
               the implementation of "fish, wildlife, and habitat
16             restoration purposes authorized by this title..."
               Section 3406(b)(2) also provides that the 800,000 acre
17             feet may be used to "help" meet obligations under the
               Endangered Species Act and to "assist" in meeting water
18             quality standards. If Interior were required to deduct
               some or all the water it uses for water quality and
19             Endangered Species Act purposes from the (b)(2)
               dedication, the water needed for implementation of the
20             Improvement Act's restoration mandate could be
               relegated to a secondary role, or perhaps no role at
21             all. Such a scenario would directly conflict with the
               Interior's mandate to give effect to the hierarchy of
22             purposes established in Section 3406(b)(2)

23 *Bay Institute of San Francisco v. United States,* 87 Fed. Appx 637

24 at 639-40 (9th Cir. 2004).

25

26      C.   Federal Defendants' Development of (b)(2)
             Policy/Guidance.
27
        Following the district court's March 2002 entry of partial
28

**5**

1  final judgment and while the case was on appeal, Interior issued

2  a "Final Decision on Implementation of Section 3406(b)(2)...,"

3  dated May 9, 2003.[1]  (AR 2137-2148.)  Interior determined that the

4  stated purpose of the Decision was to exercise "Secretarial

5  discretion to implement (b)(2) in accordance with the language of

6  the CVPIA, the intent of Congress, as well as to make this

7  Decision consistent with the Rulings of the District Court...."

8  (AR 2137-38.)  The Decision stated:

9              Interior will manage (b)(2) water in order to
            effectuate the purposes and goals of the CVPIA. Among
10           the purposes of the CVPIA as set out in the statute are
            to protect, restore, and enhance fish, wildlife and
11           associated habitats in the Central Valley and Trinity
            River basins; to address the impacts of the CVP on
12           fish, wildlife and associated habitats; to contribute
            to the State of California's interim and long-term
13           efforts to protect the San Francisco Bay/Sacramento-San
            Joaquin Delta Estuary; and to achieve a reasonable
14           balance among competing demands for use of CVP water,
            including the requirements of fish and wildlife,
15           agricultural, municipal and industrial, and power
            contractors, Sections 3402(a), (b), (e) and (f).

16
             Water dedicated under (b)(2) will continue to be used
17           to implement the fish, wildlife, and habitat
            restoration purposes and measures authorized by the
18           CVPIA, as well as to assist in meeting the 1995 Delta
            Water Quality Control Plan (WQCP) requirements and
19           post-1992 obligations under the Endangered Species Act
            (ESA).
20
   (AR 2138.)  The May 9, 2003 Decision provided the following
21
   limited guidance regarding accounting of WQCP and ESA
22

23  ─────────────────

24        [1]    The Decision addressed public comments solicited on an
   earlier draft.  In response to a comment from Plaintiffs
25  regarding the accounting treatment of (b)(2) water for WQCP and
   ESA purposes, the Federal Defendants stated that "only meeting
26  the WQCP and post-1992 ESA requirements may not be sufficient to
   meet the anadromous fish doubling goal and other restoration
27  purposes and measures included in CVPIA."  (AR 2326 (Response
   6j).)
28

1  obligations:

2         Interior will continue to fulfill the commitment to
       meet the 1995 Bay-Delta WQCP obligations (SWRCB D1641).
3      These costs will be accounted as the increase in
       releases and decrease in exports, compared to releases
4      and exports that would have resulted from simulated CVP
       baseline operations during the same period.  The CVP
5      will be operated in accordance with the WQCP
       obligations and ESA obligations.  <u>Interior will account</u>
6      <u>for the total amount of CVP water costs associated with</u>
       <u>meeting the WQCP obligations and ESA obligations</u>
7      <u>imposed after enactment of CVPIA against the annual</u>
       <u>(b)(2) allocation, up to the balance of (b)(2) water</u>
8      <u>remaining at the time the cost is incurred</u>.

9  (AR 2146 (emphasis added).)

10      The May 9, 2003 Decision also provided details about

11 forecasting, monthly and final accounting processes, potential

12 modifications of CVP operations, water banking and exchange

13 procedures, the use of water to meet WQCP and ESA obligations,

14 and shortage criteria.  (AR 2138-2149.)

15      Shortly after Interior issued its May 9, 2003 Decision, the

16 Ninth Circuit issued its initial ruling on the appeal, reversing

17 the district court's partial final judgment regarding the

18 crediting of (b)(2) water to ensure that "Interior's allocation

19 gives effect to the hierarchy of purposes established in Section

20 3406(b)(2)."  66 Fed. Appx. 734 (9th Cir. June 3, 2002).

21 Thereafter, Interior committed to undertaking a review of its May

22 2003 Decision in light of the Ninth Circuit's ruling.

23      Interior completed its review on December 17, 2003 and

24 issued a joint Bureau-FWS Memorandum:  "Guidance for

25 Implementation of Section 3406(b)(2) of the CVPIA" ("December

26 2003 Guidance Memo").  (AR 2156-58.)  Interior emphasized the

27 Ninth Circuit's holding that the "non-mandatory language" of

28 section 3406(b)(2) gives Interior "the discretion to allocate the

7

1   800,000 acre-feet among fish and wildlife, water quality, and

2   endangered species obligations, as long as Interior's allocation

3   gives effect to the hierarchy of purposes established in

4   3406(b)(2)."   (AR 2156.)   The December 2003 Guidance Memo further

5   explains:

> The October 1 through September 30 accounting period
> described in the May 9, 2003 Decision allows Interior
> to implement actions that effectuate the "hierarchy of
> purposes" referred to in the June 3, 2003 Ninth Circuit
> Decision.   The May 9, 2003 Decision specifically
> provides for a target of up to 200,000 acre-feet of use
> in the October through January period, primarily for
> high priority fish and wildlife uses.   Moreover,
> actions taken pursuant to the 1995 Water Quality
> Control Plan and State Water Resources Control Board
> Decision D-1641 ("the 1995 WQCP") involve the
> dedication and management of Central Valley Project
> yield for long-term fishery beneficial use and
> protection.   Such actions are not taken to help meet
> agricultural or municipal and industrial water quality
> standards that are set forth in the 1995 WQCP.   Most of
> the fishery beneficial uses and objectives under the
> 1995 WQCP and in Reclamation's water rights permits
> help fulfill the fish, wildlife, and habitat
> restoration purposes and measures authorized by Section
> 3406(b).   Consistent with the June 3, 2003 Ninth
> Circuit decision, much of the (b)(2) water that is
> dedicated and managed annually to help meet fishery
> beneficial use and protection objectives of the 1995
> WQCP serves Section 3406(b)(2)'s "primary purpose" of
> fish, wildlife, and habitat restoration.   Therefore the
> implementation of Section 3406(b)(2) in accordance with
> the May 9, 2003 Decision and with this supplemental
> guidance effectuates the "hierarchy of purposes" in
> Section 3406(b)(2).

(AR 2156-57.)

       One month later, on January 23, 2004, the Ninth Circuit

issued its amended decision.   87 Fed. Appx. 637.   Interior

reviewed the amendment and considered it when implementing

(b)(2), (*see* Doc. 685 at 9), but made no further changes to its

written Guidance or other policy documents.

1

2

**D.   Implementation of (b)(2) Accounting for the 2004 Water Year**.

**1.   General Approach to Forecasting**.

The (b)(2) accounting year mirrors the CVP water year and runs from October 1 through September 30.  (First Fujitani Decl., Doc. 685, at ¶6.)  Beginning in October 2003, the Bureau prepared a series of forecasts for CVP operations.  (*Id*. at ¶7.)  These forecasts "typically included two forecasted hydrologic scenarios.  One scenario utilized a hydrology with a 90% chance of being exceeded (90% forecast) and the second forecast scenario utilized a hydrology with a 50% chance of being exceeded (50% forecast)."  (*Id*.)  For each of these two hydrologic scenarios, the Bureau prepared a set of forecasts, typically including forecasts of CVP operations: (1) under pre-1992 conditions (the "baseline forecast"); (2) under State Water Resources Control Board ("SWRCB") Decision 1641 ("D-1641") (the "water quality control plan forecast")[2]; and (3) with other (b)(2) actions (the "(b)(2) forecast").  (*Id*. at 8.)

The Bureau developed the (b)(2) forecast by first estimating the projected monthly annual CVP water costs of implementing D-1641.  This was accomplished by comparing the 90% baseline forecast with the 90% WQCP forecast.  In addition, the "fishery costs" of implementing D-1641 were estimated.  (*Id*. at ¶9.)[3]

---

[2]   D-1641 promulgated the 1995 Water Quality Control Plan ("WQCP") and the two are used interchangeably by the parties.

[3]   Mr. Fujitani does not indicate how the Bureau determines whether the "fishery costs" of D-1641 are counted as (b)(2) costs.  Nor does he explain how WQCP or ESA uses are divided among primary and secondary purposes.

Then, the Bureau consulted with FWS to incorporate other planned (b)(2) actions into the forecast. (*Id*.)

> ### 2. The Mid-March 2004 Trigger of the Port Chicago Objective.

The WQCP objectives contained in D-1641 are sensitive to actual hydrological conditions. (*Id*. at ¶12.) One such objective is maintenance of two-parts-per-thousand of salinity (known as "X2") at Port Chicago in the Delta. (*Id*.) The location of X2 reacts quickly to unregulated storm runoff. Under certain circumstances, the Bureau may be required to significantly increase releases from the CVP reservoirs and reduce exports. (*Id*.) During the relevant period of time, the Bureau accounted for the Port Chicago/X2 objective[4] as (b)(2) fishery costs. (*Id*.)

In mid-March 2004, a series of storms triggered the Port Chicago/X2 objective for April. (*Id*. at ¶13.) Accordingly, in April 2004, the Bureau modified CVP operations to meet the objective. (*Id*.) Because the actual position of X2 is highly dependent upon conditions beyond the operators' control, the Bureau and DWR ensured compliance with the objective by providing the required net Delta outflow, through increasing reservoir releases and reducing pumping from the Delta at the Bureau's Jones pumping plant and DWR's Banks pumping plant. (*Id*.)

These changes, made in April, were not predicted in the March forecasts. For example, the March 90% forecast, predicted

---

[4]    The Port Chicago objective requires either that X2 be maintained west of Port Chicago or that the minimum net Delta outflow index be maintained for the requisite number of days, as set forth in D-1641.

WQCP costs of approximately 1,000 AF for CVP releases and
approximately 76,000 AF for export operations, with fishery costs
for the entire water year estimated to be 800,000 AF.  (*Id.* at
¶14.)   In the April 90% forecast, which included the actions
taken in April to meet the Port Chicago objective, the water
costs grew to approximately 317,000 AF for CVP releases and
115,000 AF for CVP export actions.  (*Id.*)   The total estimated
fishery costs increased to 1,053,000 AF.  (*Id.*)

In the final daily (b)(2) accounting for the April actions
taken to meet the Port Chicago objective, which is based on a
comparison of daily CVP operations against the daily hypothetical
CVP operations under the baseline (pre-1992) conditions, Interior
estimated the fisheries costs in April to be approximately
236,000 AF for CVP release actions and approximately 129,900 AF
for CVP Export actions.  (*Id.* at ¶14.)

### 3.   Interior's Response.

Once it "became apparent that the costs associated with
implementation of the WQCP were increasing in April, Interior
took actions to reduce other (b)(2) actions and sought to utilize
Environmental Water Account (EWA) assets to the extent possible
to manage the annual (b)(2) operations and accounting."  (*Id.* at
¶15; *see also* First Guinee Decl., Doc. 685-5, at ¶11 (indicating
that once it was determined that approximately 775,000 AF would
be used by the end of May, the "remaining use of (b)(2) water
from June through September was prioritized to dedicate (b)(2)
water to the primary purpose of fish, wildlife and habitat
restoration, particularly salmon restoration and doubling on

1  Clear Creek").)[5]  Multiple responsible agencies used EWA assets in
2  place of (b)(2) assets at Jones pumping plant, totaling 64,000 AF
3  in April and May.  (First Fujitani Decl. at ¶15)

4      Mr. Fujitani asserts that no additional EWA actions could be
5  taken because of limited EWA assets.  (*Id.*)  Mr. Snow disputes
6  this assertion.  (Suppl. Snow Decl., Doc. 692, at ¶5.)
7  Regardless of the availability of EWA assets and/or the extent of
8  Interior's efforts to reduce (b)(2) actions, more than 800,000 AF
9  of CVP yield was used for fishery-related actions during the 2004
10 (b)(2) accounting year.

---

12      [5]   Plaintiffs suggest that after Interior realized that it
13 was going to overshoot the 800,000 AF limit, they considered a
   variety of scenarios, citing AR 1216-17; 21-22; 27-28; 89-93;
14 114-15; 23-27, but chose a "no action alternative."  In support
   of this assertion, Plaintiffs reference a table describing
15 various alternatives at AR 1216.  In that table, the "no action"
   alternative is described as an approach that would "[i]mplement
16 WQCP and other primary purpose actions, let accounting go as
   accumulated, now projected at 978 TAF."  *Id.* (emphasis added).
17 It describes the benefits of this approach as being "[e]asy to
   implement" and "implements all primary purpose actions."  *Id.* The
18 risks are described as:  "B2 costs estimated at 978 TAF, most
   likely to be challenged by stakeholders."  *Id.*  Other
19 alternatives are listed on this chart, but the record does not
   reveal which of these, if any, Interior eventually selected for
20 implementation.  Plaintiffs suggest that, despite not expressly
   choosing an alternative, Interior actually chose the "no action
21 alternative."  This makes some sense, given that, of the listed
   options, the no action alternative's estimate of 978 TAF of
22 (b)(2) costs is closest to the actual amount expended on (b)(2)
   and "Non-B2 Fishery Actions."  However, both Mr. Fujitani and Mr.
23 Guinee take issue with the assertion that Interior decided to do
   nothing in response to the situation.  Both state that Interior
24 took steps to minimize (b)(2) actions in the face of mounting
   water costs.  (First Guinee Decl. at ¶10; First Fujitani Decl. at
25 ¶15.)  Plaintiffs provide no evidence to the contrary.
26
27
28

1  Under the final, daily (b)(2) accounting for the entire 2004
2  water year, 799,000 AF of CVP yield were used for (b)(2)
3  purposes, while 159,200 AF were used for other "Non-B2 Fishery
4  Actions."  (*Id.* at ¶10.)  The 159,200 AF for "Non-B2 Fishery
5  Actions" was primarily used for two purposes:  (1) from June 17
6  through June 30, 2004, water was released at Nimbus Reservoir and
7  New Melones Reservoir for fisheries purposes; and (2) from August
8  1 through September 30, 2004, the Bureau pumped less water than
9  it otherwise would have for fishery purposes, representing a loss
10 of replacement export pumping that otherwise would have taken
11 place under D-1485 to compensate for May fisheries actions.

12

13                     III.   <u>STANDARD OF REVIEW</u>

14     A.   <u>Review Under the Administrative Procedure Act.</u>

15     This case concerns a challenge to administrative agencies'
16 implementation of the CVPIA.  Because CVPIA contains no private
17 right of action or provision for judicial review, the
18 Administrative Procedure Act ("APA") governs judicial review of
19 agency action in this case.  5 U.S.C. §§ 701-706.  Under the APA,
20 federal courts can only review whether agency decisions were
21 "arbitrary, capricious, an abuse of discretion, or otherwise not
22 in accordance with law."  5 U.S.C. § 706(2)(A).  "This
23 deferential standard is designed to ensure that the agency
24 considered all of the relevant factors and that its decision
25 contained no clear error of judgment."  *Pac. Coast Fed'n of*
26 *Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001)
27 ("*PCFFA*").  Agency action should only be overturned if the agency
28 has "relied on factors which Congress has not intended it to

                                13

consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518, 2529 (2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Essentially, a court must ask "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *PCFFA*, 265 F.3d at 1034.

As a general rule, a court must defer to the agency on matters within its expertise. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005). "Deference to the informed discretion of the responsible federal agencies is especially important, where, as here, the agency's decision involves a high level of technical expertise." *Id.* However, "[t]he deference accorded an agency's scientific or technical expertise is not unlimited." *Id.* "Deference is not owed when the agency has completely failed to address some factor consideration of which was essential to [making an] informed decision." *Id.* (internal citations and quotations omitted). Nevertheless, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Home Builders*, 127 S. Ct. at 2530.

14

1

**B.    Consideration of Extra-Record Evidence.**

2       Normally in an APA case, extra-record evidence is not

3   admissible, unless it falls into one of several discrete

4   exceptions to the general rule.  *See N.W. Envtl. Advocates v.*

5   *Nat'l Marine Fisheries Serv.*, 460 F. 3d 1125, 1145 (9th Cir.

6   2006).  In this case, the complaint presents an "as-applied"

7   challenge to the implementation of (b)(2) in the 2004 (b)(2)

8   accounting year.  Accordingly, the "final agency action" is not a

9   single agency "decision," but rather the continued implementation

10  of agency policy over the course of an entire water year,

11  including monthly forecasting and daily adjustments to a complex

12  operation.  The Federal Defendants have prepared an

13  administrative record.  However, all parties have agreed that

14  because of the technical nature of the (b)(2) accounting process,

15  the case requires extra-record expert analysis.  Plaintiffs have

16  filed the declarations of James Snow, an engineer employed by

17  Westlands, and Dan Nelson, the Executive Director of the

18  Authority; Federal Defendants filed the declarations of Paul E.

19  Fujitani, Chief of the Water Operations Division in the Bureau's

20  Central Valley Operations Office, and Roger Guinee, the Water

21  Operations Chief for FWS's Water and Fishery Resources Program;

22  and Environmental Plaintiffs filed the 2001 declaration of Spreck

23  Rosekrans, a water operations expert employed by Environmental

24  Defense.  These declarations, to the extent they contain legally

25  admissible information and opinions, shall be considered to

26  assist the court to understand complex and technical scientific

27  issues raised by accounting under (b)(2) for CVP annual

28  operations.

1

IV.   DISCUSSION

2

A.   Justiciability Issues.

3     The district court must, either *sua sponte* or at the request
4  of the parties, evaluate the issues of standing and mootness.
5  *See Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, 593
6  (2004) ("It is the obligation of both district court and counsel
7  to be alert to jurisdictional requirements."); *c.f. Am. Civil*
8  *Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1015 (9th Cir.
9  2006) (Court of Appeals has an "independent obligation" to
10 consider standing and mootness *sua sponte* on appeal if issues not
11 raised by parties).   Here, Federal Defendants challenge
12 Plaintiffs' standing to sue and assert that their claims are
13 moot.

14     1.   Standing.

15     To maintain an action in federal court, Plaintiffs must
16 satisfy both Article III and APA standing requirements.   *See*
17 *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872 (1990) ("*Lujan*
18 *v. NWF*").

19     a.   Article III Standing.

20     "[T]o satisfy Article III's standing requirements, a
21 plaintiff must show (1) it has suffered an "injury in fact" that
22 is (a) concrete and particularized and (b) actual or imminent,
23 not conjectural or hypothetical; (2) the injury is fairly
24 traceable to the challenged action of the defendant; and (3) it
25 is likely, as opposed to merely speculative, that the injury will
26 be redressed by a favorable decision."   *Friends of the Earth v.*
27 *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

28     The burden of establishing these three elements falls upon

16

the party asserting federal jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The elements of standing are "not mere pleading requirements."  *Id*.  Rather, they are an "indispensable part of the plaintiff's case," and accordingly must be supported at each stage of litigation in the same manner as any other essential element of the case.  *Id*.

### (1)   Injury in Fact/ Causation.

To satisfy the "injury in fact" requirement, Plaintiffs must provide evidence of either actual or threatened injury.  *See United States v. Ensign*, 491 F.3d 1109, 1116-17 (9th Cir. 2007).  The second standing requirement, causation, requires that the injury be "fairly traceable" to the challenged action of the defendant, and is not "the result of the independent action of some third party not before the court."  *Tyler v. Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000).  Plaintiffs assert that they have suffered actual injury and are threatened with future injury as a result of the manner by which Federal Defendants' implemented (b)(2) in 2004 and plan to implement (b)(2) in the future.

### (a)   Past Harm From Implementation of Accounting Practices in 2004.

Plaintiffs allege that they "have a beneficial interest in the water appropriated by the CVP," and that "[t]hey will suffer most, if not all, of any reductions in water supply resulting from implementation of the 2003 Decision in a manner that causes exceedence of the 800,000 acre-foot statutory limit...especially where such implementation involves CVP export reductions."  (Doc. 656 at ¶11.)  More specifically, Plaintiffs contend that they suffered actual injury in 2004, resulting from:

17

> Interior's over-allocation of water for fish and
> wildlife [purposes] and failure to use available EWA
> assets to compensate for such actions.  In 2004, demand
> exceeded supply; Reclamation's water allocation for
> south of Delta service contractors was 65% of contract
> supplies for most of the irrigation season.  (Snow
> Decl. ¶3.) To compensate for reduced CVP deliveries,
> Westlands, for example, purchased additional supplies,
> and its landowners pumped additional groundwater.  (*Id.*
> at ¶4.) Interior used EWA to compensate for some fish
> actions in 2004, but there were additional EWA assets
> available to Interior in 2004 that it chose not to use.
> (*Id.* at ¶¶6-9.)  Those assets could have been used to
> compensate the CVP for fish actions that were instead
> assigned to the "Non-B2 Fishery Action" columns.  (*Id.*
> at ¶9.)  If interior had used more available EWA assets
> to cover the fish actions in 2004, CVP agricultural
> service contractors would likely have received a higher
> contract allocation in 2004.  (*Id.* at ¶9-10.)  Instead,
> Interior claimed discretion to simply not count these
> uses, and [claimed] that it was not required to
> compensate for these actions.

(Doc. 690 at 17.)

Plaintiffs advance two claims of injury.  First, they claim

their water deliveries were reduced as a result of Interior's

decision to count certain actions as "Non-B2 Fishery Actions."

However, apart from asserting that demand exceeded supply in

2004, that deliveries in 2004 were less than 100%, and that

Plaintiffs had to either purchase alternative supplies or pump

water as a result, Plaintiffs do not specifically explain how

Interior's 2004 Water Year accounting actions resulted in reduced

water deliveries.

Mr. Nelson, the Authority's Executive Director, explains

Plaintiffs injury theory, but provides no specific information

about causation.

> The CVP water supplies available to [its] member
> agencies are directly affected by the manner in which
> [Interior] dedicates and manages the 800,000 acre-feet
> account....Members are particularly affected by use of
> the (b)(2) account to impose reductions in export
> pumping at Jones Pumping Plaint, as all members receive

18

their CVP supplies through that plant.  To the extent
Interior fails to count water used for fish and
wildlife purposes against the (b)(2) account, Interior
may cause a loss of water supply to member agencies by
reallocating CVP supplies from municipal and irrigation
uses to fish and wildlife uses.

(Nelson Decl., Doc. 691, at ¶4.)

        Plaintiffs' most specific causation argument is provided by

Mr. Snow, who states:

        To a significant extent, the allocation of CVP yield to
        various uses is a zero sum game.  Allocation to one use
        will usually result in at least a significant reduction
        in supply available to another, competing use.  One of
        these demands is the dedication of CVP yield under
        section 3406(b)(2) of the [CVPIA].  Reductions in
        export pumping pursuant to (b)(2), in particular, can
        have significant effect upon supply for south of Delta
        CVP contractors.

(Suppl. Snow Decl., Doc. 692, at ¶10.)

        Mr. Fujitani opines that, due to the complexities of

operating the CVP, Plaintiffs need additional information before

they can show whether the challenged actions affected water

supply:

        The impact to the available water supply could be
        affected by several conditions including reservoir
        fill, export capacity, conveyance losses, Delta
        carriage losses, and operational criteria at the time
        of the action.  Additional information would be needed
        on the location, timing and flow rates of any actions
        to estimate potential water supply impacts.

(Suppl. Fujitani Decl., Doc. 696-2, at ¶18.)  The implication of

this is that the challenged actions are just one of many causes

that impact CVP water deliveries.  However, Federal Defendants

accounted for these actions as <u>reductions</u> from CVP yield, albeit

"Non-B2 fishery action" deductions.  If this reduction of CVP

annual yield did not cause losses to CVP contractors, Federal

Defendants have not explained why.  Absent any such explanation,

19

1 | Plaintiffs satisfy the injury-in-fact requirement.[6]

2 |     Plaintiffs alternatively assert that they were injured
3 | because they should have been compensated under the EWA for any
4 | water lost to fishery actions that exceeded 800,000 AF of CVP
5 | yield.  They maintain Interior had additional EWA assets
6 | available in 2004 that it chose not to use.  Specifically, Mr.
7 | Snow maintains that Federal Defendants had "approximately 275,000
8 | acre-feet of water available for EWA actions that they did not
9 | use in 2004."  (Suppl. Snow Decl. at ¶7.)  Mr. Snow derived that
10 | figure from his review of a table entitled "Environmental Water
11 | Account Water Acquisitions in 2003_04 (Fiscal Year)," which
12 | indicated that 430,000 AF of water was available for purchase,
13 | while only 155,000 AF of water was actually purchased.  (*See id*.
14 | at ¶¶ 5-7.)  Mr. Snow does not explain why the entire 430,000 AF

15 |

16 |       [6]    Federal Defendants' reliance on the district court's
decision after remand in *Central Delta Water Agency v. Norton*,
17 | 327 F. Supp. 2d 1180, 1190 (E.D. Cal. 2004) is misplaced.  In
18 | that case, the Court of Appeals reversed an earlier district
court decision and found that Plaintiffs had standing even though
19 | a statutory violation had not yet occurred and the probability of
future harm was small, finding that a "credible threat of harm"
20 | was sufficient.  *Central Delta Water Agency v. Norton*, 306 F.3d
938, 949 (9th Cir. 2002).  The Ninth Circuit remanded the case
21 | for further decision on the merits.  Plaintiffs then argued that
the Ninth Circuit's finding of a credible threat of harm entitled
22 | them to summary judgment on the <u>merits</u> of their statutory
23 | violation claim.  The district court rejected Plaintiffs' attempt
"to extrapolate the Ninth Circuit's opinion, to establish,
24 | without any evidence, an actual violation of the [statute in
25 | question]."  327 F. Supp. 2d at 1212.  Although the Ninth
Circuit's ruling on the issue of standing was discussed, standing
26 | was not decided by the district court on remand.  Rather, the
27 | district court held that Plaintiffs presented no evidence of
actual injury required to survive summary judgment on the merits.
28 | *Id*.

of water should be considered "available for EWA actions" before
it was purchased by the Federal Defendants from a limited funding
pool, or that Interior was under any enforceable duty to purchase
external water assets if the water does not exist in the CVP.[7]

Mr. Fujitani declares that use of these assets was "limited
by both the location of the assets and the authorized place of
use of the assets." (Suppl. Fujitani Decl. at ¶¶8-9.) For
example, Mr. Snow argues that the Bureau could have exercised an
option to obtain water for the EWA from the Kern County Water
Agency. (Suppl. Snow Decl. at ¶8.) However, Mr. Fujitani
explains that this potential water transfer would have been
limited in its place of use to a State Water Project place of

_____

[7]    Mr. Snow also asserts that the Federal Defendants had
approximately $28 million available for EWA acquisitions that it
did not spend in 2004. Mr. Snow bases this figure on the same
table cited above. He compared a $47,197,500.00 figure from that
table, representing the total cost of acquisitions if all options
to purchase were exercised, to a $19,570,000.00 figure,
representing the amount of money spent. Mr. Snow opines that
Federal Defendants had but did not spend the difference between
the $19,570,000.00 figure and the $47,197,500.00 figure,
approximately $28 million, available for EWA acquisitions. (Snow
Decl., Doc. 682, at ¶¶5-6.) Mr. Snow does not explain why the
difference between these figures represents a balance of
available funding. To the contrary, Mr. Fujitani denies that
such funding was available, stating that the EWA is managed by
numerous government agencies, including FWS, the Bureau, NMFS,
DWR, and the California Department of Fish and Game. (Suppl.
Fujitani Decl. at ¶6.) "Generally, water acquisitions are funded
by both the State of California and the Federal government, and
managed by all of the agencies identified above. In water year
2004, very little, if any, of the funding for the EWA water
acquisitions came from the Federal Government." (*Id.*) Moreover,
no legal authority is provided that this EWA acquisition fund is
a non-discretionary source of funding the court could require
Interior to expend for CVP water service purposes.

1  use.  (Suppl. Fujitani Decl. at ¶7.)  After April and May,

2  "[a]dditional EWA actions could not be used at the CVP because of

3  limited EWA assets."  (First Fujitani Decl. at ¶6.)  Plaintiffs'

4  evidence does not undermine Mr. Fujitani's declaration.

5  Nevertheless, Plaintiffs satisfy the injury in fact test on other

6  grounds, as discussed above.

7                    **(b)   Threat of Future Harm**.

8      Plaintiffs also claim that they face the threat of future

9  injury because "Interior claims the discretion to refrain from

10 counting future fish actions [utilizing CVP yield] required by

11 the WQP or post- enactment ESA requirements.  While Interior has

12 not invoked that claimed discretion in the accounting years since

13 2004, it does not disavow any intention to do so in the

14 future....To the extent that Interior claims the ability to take

15 more fish actions in future years by not counting fish actions

16 against the (b)(2) account, Interior threatens future injury to

17 CVP water users including the members of the authority."  (Doc.

18 690 at 17.)

19      "[T]he possibility of future injury may be sufficient to

20 confer standing on plaintiffs; threatened injury constitutes

21 injury in fact."  *Central Delta Water Agency v. United States,*

22 306 F.3d 938, 947-48 (9th Cir. 2002) (quoting *Ecological Rights*

23 *Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000));

24 *Laidlaw*, 528 U.S. at 180-81 (holding that "the threat

25 of...'injury in fact'" is sufficient to confer standing).

26 "Threatened environmental harm is by nature probabilistic....

27 [P]roducing evidence [of] an increased risk to its member's []

28 uses...is sufficient to provide injury in fact."  *Friends of the*

                              22

1  *Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 159-60 (4th

2  Cir. 2000) (en banc).  The Ninth Circuit explained in *Pacific*

3  *Lumber*, a case involving an alleged Clean Water Act violation,

4  "to require actual evidence of environmental harm, rather than an

5  increased risk based on a violation of the statute,

6  misunderstands the nature of environmental harm, and would

7  undermine the policy of the...Act."  230 F.3d at 1151.

8      The relevant inquiry here is whether Plaintiffs face

9  "significant risk" that their water supply will be reduced in the

10  future as a result of the Bureau's (b)(2) accounting decisions in

11  operating the CVP.  *See Central Delta*, 306 F.3d at 948; *see also*

12  *Covington v. Jefferson County*, 358 F.3d 626, 652 (9th Cir.

13  2004)(heightened risk of serious harm sufficient to provide

14  standing);  *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001)

15  (holding that "evidence of a credible threat to the plaintiff's

16  physical well-being from airborne pollutants" is sufficient to

17  satisfy the injury requirement); *Churchill County v. Babbitt*, 150

18  F.3d 1072, 1078 (9th Cir. 1998) as amended, 158 F.3d 491 (9th

19  Cir. 1998) (plaintiff need only establish "the reasonable

20  probability of the challenged action's threat to [his] concrete

21  interest").

22      Federal Defendants maintain that Plaintiffs have produced no

23  evidence that suggests they face a "significant risk" of future

24  harm resulting from Interior's (b)(2) accounting procedure.

25  Federal Defendants emphasize that the 2004 (b)(2) accounting year

26  was the only time since enactment of the CVPIA that combined

27  actions under the primary and secondary CVPIA purposes exceeded

28  800,000 AF.  However, Federal Defendants neglect to mention that

Interior had no reason to believe it had discretion to exceed the 800,000 AF limit, which represented a specifically defined upper limit on CVP yield allotted to (b)(2) purposes, until the Ninth Circuit's decision in January 2004.  Although the limit has not been exceeded again since then, they offer no assurances that they will not do so in the future.  It has been exceeded once in the past four full (b)(2) accounting years and current critically dry conditions only add to the likelihood of future exceedences.

### (2)   Redressibility.

Plaintiffs seek (1) a declaration that Federal Defendants do not have discretion to refrain from counting fish actions taken pursuant to the WQCP or post-CVPIA ESA requirements toward the (b)(2) allocation, and (2) an injunction prohibiting Federal Defendants from failing to count such actions against the (b)(2) allocation in the future.  A favorable ruling in this case would redress the alleged injury of loss to Plaintiffs of their full annual allocations of CVP water.

### b.   Associational Standing.

An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  The Authority satisfies these requirements.  Its membership includes Westlands and numerous other similarly situated public agencies that contract with Interior for water service.  Westlands and the

1   Authority's other member agencies have standing to sue in their

2   own right under the Reclamation Act, *see* 43 U.S.C. § 511.  The

3   interests the Authority seeks to protect in this lawsuit are

4   germane to the organization's stated purpose, namely to preserve

5   and protect water rights and benefits of the member agencies in

6   the Central Valley Project.  (Nelson Decl. at ¶2.)  There is no

7   reason why the claim asserted requires the participation of the

8   Authority's individual member agencies, which are barred by the

9   Reclamation Act from bringing suit directly against Interior,

10  because they are not directly contracting parties, nor are they

11  in privity with Interior, as their water service contracts are

12  with Plaintiffs' member agencies.  (*See* 43 U.S.C. § 511; *see also*

13  *Sumner Peck Ranch Inc. v. Bureau of Reclamation*, 1:88-cv-00634

14  OWW DLB, Doc. 691 at 65.)

15                    c.   <u>APA Standing</u>.

16       Because the CVPIA contains no private right of action to

17  challenge implementation of its provisions, Plaintiffs seek

18  judicial review in this case under § 10(a) of the APA, which

19  provides:

20            A person suffering legal wrong because of agency
            action, or adversely affected or aggrieved by agency
21            action within the meaning of a relevant statute, is
            entitled to judicial review thereof.
22
23  5 U.S.C. § 702.

24       In *Lujan v. NWF*, the Supreme Court explained that "this

25  provision contains two separate requirements."

26            First, the person claiming a right to sue must identify
            some "agency action" that affects him in the specified
27            fashion; it is judicial review "thereof" to which he is
            entitled. The meaning of "agency action" for purposes
28            of § 702 is set forth in 5 U.S.C. § 551(13), see 5
            U.S.C. § 701(b)(2) ("For the purpose of this chapter

                              **25**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

... 'agency action' ha[s] the meanin[g] given ... by section 551 of this title"), which defines the term as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13). When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the "agency action" in question must be "final agency action." See 5 U.S.C. § 704 ("Agency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review" (emphasis added)).

Second, the party seeking review under § 702 must show that he has "suffer[ed] legal wrong" because of the challenged agency action, or is "adversely affected or aggrieved" by that action "within the meaning of a relevant statute." Respondent does not assert that it has suffered "legal wrong," so we need only discuss the meaning of "adversely affected or aggrieved ... within the meaning of a relevant statute." As an original matter, it might be thought that one cannot be "adversely affected or aggrieved within the meaning " of a statute unless the statute in question uses those terms (or terms like them)-as some pre-APA statutes in fact did when conferring rights of judicial review. *See, e.g.,* Federal Communications Act of 1934, § 402(b)(2), 48 Stat. 1093, as amended, 47 U.S.C. § 402(b)(6) (1982 ed.). We have long since rejected that interpretation, however, which would have made the judicial review provision of the APA no more than a restatement of pre-existing law. Rather, we have said that to be "adversely affected or aggrieved ... within the meaning" of a statute, the plaintiff must establish that the injury he complains of ( his aggrievement, or the adverse effect upon him ) falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. See Clarke v. Securities Industry Assn., 479 U.S. 388, 396-397(1987). Thus, for example, the failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.

497 U.S. at 883.

As to the first requirement, Plaintiffs have identified an

1  "agency action" -- Interior's decision to refrain from counting

2  certain uses of water as (b)(2) actions during the 2004 (b)(2)

3  accounting year -- that has adversely affected Plaintiffs in a

4  specified fashion.  Those accounting decisions amount to final

5  agency actions for which there is no other adequate remedy in a

6  court of law.

7      As to the second requirement, *Lujan v. NWF* indicates that to

8  be "adversely affected or aggrieved ... within the meaning" of a

9  statute, Plaintiffs must establish that the injury they complain

10 of falls within the "zone of interests" sought to be protected by

11 the statutory provision, the violation of which forms the legal

12 basis for their complaint.  *Id*.  Here, one of the stated purposes

13 of the CVPIA is to "achieve a reasonable balance among competing

14 demands for use of [CVP] water, including the requirements of

15 fish and wildlife, agricultural, municipal and industrial and

16 power contractors."  CVPIA § 3402(f).  Plaintiffs' alleged injury

17 -- reduced water deliveries to agricultural, municipal, and

18 industrial contractors -- falls squarely within the zone of

19 interest of the CVPIA.

20            d.   Conclusion Re Standing.

21     Plaintiffs satisfy all the Article III and prudential

22 standing requirements.

23          2.   Mootness.

24     Federal Defendants also argue that this action is moot.

25 The case or controversy requirement of Article III of the Federal

26 Constitution deprives the Court of jurisdiction to hear moot

27 cases.  *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70

28 (1983).  "A case is moot when the issues presented are no longer

27

1  'live' or the parties lack a legally cognizable interest in the

2  outcome.  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).

3  "To satisfy the Article III case or controversy requirement, a

4  litigant must have suffered some actual injury that can be

5  redressed by a favorable judicial decision."  *Iron Arrow*, 464

6  U.S. at 70.  The test for mootness is whether the court can give

7  the parties "any effective relief in the event that it decides

8  the matter on the merits in his favor.  That is, whether the

9  court can 'undo' the effects of the alleged wrongdoing."  *Reimers*

10  *v. Oregon*, 863 F.2d 630, 632 (9th Cir. 1988) (internal citations

11  and quotations omitted).

12      Here, Plaintiffs assert that a continuing live controversy

13  does exist over the meaning and implementation of 3406(b)(2).

14  However, the specific injury complained of with respect to the

15  2004 water year -- the alleged reduction in deliveries -- cannot

16  be redressed by a favorable judicial decision.  That water year

17  is over and Plaintiffs do not seek damages related to or

18  reimbursement for that 2004 loss.

19      However, Plaintiffs complain that Interior "may refrain from

20  counting the cost of any such [WQCP or ESA] actions" in a future

21  water year.  This invokes an exception to the mootness rule for

22  injuries that are "capable of repetition yet evading review."

23  The exception is met when if "(1) the duration of the challenged

24  action is too short to allow full litigation before it ceases,

25  and (2) there is a reasonable expectation that the plaintiffs

26  will be subjected to it again."  *Greenpeace Action v. Franklin,*

27  14 F.3d 1324, 1329 (9th Cir. 1992).

28      The first part of this test is satisfied here because the

1   Ninth Circuit has found that a challenged action that will run
2   its course in one or two years does not provide enough time for
3   full review.  *Biodiversity Legal Found. v. Badgley*, 309 F.3d
4   1166, 1173-74 (9th Cir. 2002).  Plaintiffs assert that the second
5   prong is also satisfied because "there is a reasonable
6   expectation that Interior will continue to implement (b)(2) in
7   the same manner as it did in 2004," because "Interior argues that
8   it [has the discretion to] take (b)(2) actions in excess of
9   800,000 acre-feet throughout its opposition brief."  (Doc. 690 at
10  20.)  It is impossible to predict whether and how often Interior
11  may invoke this authority.  Plaintiffs implicitly maintain that
12  it is unlawful for the Bureau to claim unfettered discretion to
13  not account for and charge uses of CVP yield for ESA or WQCP
14  purposes against the 800,000 annual AF dedication, and that harm
15  will arise in any future water year in which the Federal
16  Defendants claim it necessary to exercise that discretion.  This
17  presents a case of administrative action capable of repetition
18  but evading review.  Adding to the imminence and actuality of
19  this dispute is that the Ninth Circuit's decision considered only
20  one side of the interests served by the CVPIA and (b)(2).  The
21  CVPIA represented a compromise between competing needs for
22  limited CVPIA yield.  It dedicated 800,000 AF of CVP yield to
23  fish and wildlife restoration purposes.  The legislature did not
24  grant an environmental priority to use the remaining CVP yield
25  nor any other available CVP water.  The legislature defined
26  agriculture and other uses as co-equals in 3402(f), after the
27  dedication of the 800,000 AF.  The Ninth Circuit Decision focused
28  upon the consequence of "undermining (b)(2)'s primary purpose" if

1  all ESA and WQCP and related uses were counted against the

2  dedicated (b)(2) annual 800,00 AF supply.  It did not consider

3  the converse, i.e., the consequences if Interior exercised its

4  discretion to <u>not</u> charge <u>any</u> ESA, WQCP, or related uses against

5  the 800,000 AF supply.

6

7      **B.  <u>Evidentiary Objections</u>.**

8      Plaintiffs raise four objections to statements made by Mr.

9  Fujitani in his declaration and nine objections to statements

10 made by Roger Guinee.  The objections fall into two general

11 categories.  First, Plaintiffs object that four statements in Mr.

12 Fujitani's declaration and seven statements in Mr. Guinee's

13 declaration concern are improper legal opinions.

14     For example, Mr. Fujitani stated:

15         In water year 2004, Reclamation implemented (b)(2) in
           accordance with the provisions of the "Decision on
16         Implementation of Section 3406(b)(2) of the [CVPIA],"
           dated May 9, 2003 (May Decision)(AR 2137), and
17         "Guidance for Implementation of Section 3406(b)(2) for
           the CVPIA," dated December 17, 2003 (AR 2156), as well
18         as, the Ninth Circuit's rulings in the (b)(2)
           litigation.  Bay Inst. of San Francisco v. United
19         States, 66 Fed. Appx. 734 (9th Cir. 2003), as amended
           by, 87 Fed. Appx. 637 (2004).
20
21 (First Fujitani Decl. at ¶6.)  Plaintiffs correctly point out

22 that this statement at least implies the legal conclusion that

23 Interior acted lawfully by implementing (b)(2) "in accordance

   with" the Ninth Circuit decision.
24
25     Both Mr. Fujitani and Mr. Guinee acknowledge that their

26 challenged statements can be interpreted as legal conclusions.

27 They have voluntarily revised their declarations to state that

28 Interior relied on, rather than acted in "accordance with," the

1   relevant legal decisions.  (*See* Suppl. Fujitani Decl. at ¶¶ 13-
2   16; Suppl. Guinee Decl., Doc. 686-3, at ¶¶ 6-12.)   This
3   sufficiently resolves Plaintiffs' "legal conclusion" objections.

4        Plaintiffs also object to several additional statements made
5   by Mr. Guinee on the ground that they are "post hoc
6   rationalizations."  (*See* Objections 8-9, Doc. 695 at 6-7.)
7   Plaintiffs eighth objection is to the following statement made by
8   Mr. Guinee about increased flows from Nimbus during late June
9   2004:

> The Service did not recommend this flow increase to
> meet the primary fish, wildlife and habitat restoration
> purposes of the CVPIA (AR 2565).  <u>Said another way,</u>
> <u>were it not for the WQCP, the Service would not have</u>
> <u>recommended that Reclamation increase flow releases in</u>
> <u>June 17, 2004 in the American River for primary fish</u>
> <u>restoration purposes pursuant to CVPIA, Section</u>
> <u>3406(b)(2)</u>.

(First Guinee Decl. at ¶13 (emphasis added).)  Plaintiffs
maintain that Mr. Guinee's speculation about what the agency
would have done, were it not for the WQCP, is based on a single-
page document from the record, entitled "Water Year 2004 Fishery
Action Costs."  (AR 2565.)  This document does not describe what
fish actions Interior would have taken in the absence of the
WQCP; rather, it summarizes the costs of fish actions actually
taken in 2004, allocating those costs between the "primary" and
"secondary" purposes.  Mr. Guinee cannot read the Bureau's mind
and has no foundation for this opinion.  The objection is well
taken.  Mr. Guinee responds to this objection by amending and
simplifying his assertion that Interior did not recommend this
increase to meet the primary fish, wildlife, and habitat
restoration purposes of the CVPIA.  (Suppl. Guinee Decl. at ¶14.)

31

1    Plaintiffs' remaining objection is similar.  Mr. Guinee has

2  amended and simplified his statement to eliminate any language

3  that could possibly be interpreted as a post hoc rationalization

4  or speculation.  (*Id.* at ¶15.)   These changes sufficiently

5  resolve Plaintiffs' remaining objections.

6

7    C.    Lawfulness of Interior's (b)(2) Accounting in 2004.

8    CVPIA section 3406(b)(2) provides that the Secretary of the

9  Interior shall:

10         dedicate and manage annually eight hundred thousand
           acre-feet of Central Valley Project yield for the
11         primary purpose of implementing the fish, wildlife, and
           habitat restoration purposes and measures authorized by
12         this title; to assist the State of California in its
           efforts to protect the waters of the San Francisco bay
13         Sacramento-San Joaquin Delta Estuary; and to help to
           meet such obligations as may be legally imposed upon
14         the Central Valley Project under State or Federal law
           following the date of enactment of this title,
15         including but not limited to additional obligations
           under the Federal Endangered Species Act....
16
     The district court initially ruled that "[a]n a matter of
17
   law, this language is not ambiguous -- water used to meet WQCP or
18
   post-CVPIA ESA requirements is an additional (b)(2) purpose and
19
   must be charged against the 800 TAF (b)(2) mandate if so used."
20
   (Doc. 466 at 33.)
21
     The Ninth Circuit reversed:
22
           The district court erred in concluding that Interior
23         lacks discretion to refrain from crediting the amount
           of Project yield actually used for any (b)(2) purpose
24         against the designated 800,000 acre feet of Project
           yield. To hold otherwise would defeat the primary
25         purpose for which the 800,000 acre feet were
           designated-fish, wildlife, and habitat restoration.
26         Section 3406(b)(2) provides that the "primary purpose"
           to which the 800,000 acre feet should be dedicated is
27         the implementation of "fish, wildlife, and habitat
           restoration purposes authorized by this title..."
28         Section 3406(b)(2) also provides that the 800,000 acre

                               32

feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards. If Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the Improvement Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all. Such a scenario would directly conflict with the Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2).

*Bay Institute,* 87 Fed. Appx 639-40.  The essence of this holding, which is binding upon the parties to this case, is that Interior has discretion to refrain from deducting some or all of the water it uses for water quality and ESA purposes from the (b)(2) account, if such uses are for secondary purposes, but only if doing so would give effect to the statutory hierarchy of purposes and avoid relegating the CVPIA's primary restoration mandate to "a secondary role, or perhaps no role at all."  *Id.*

1.   <u>Summary of the Parties' Arguments</u>.

Plaintiffs assert that "primary purpose" should be interpreted broadly, to include the 159,200 AF designated as "Non-B2 Fishery Actions" in late June and August/September 2004, because those actions benefitted fish.  (Doc. 681 at 9.)  They suggest that any water used to meet WQCP and/or ESA purposes must be counted <u>unless</u> doing so would <u>not</u> serve any fish, wildlife, and habitat restoration purposes, <u>or</u> if counting the water toward the 800,000 AF limit would "significantly impair" the primary restoration purposes.  (*Id.*)  However, when "water is used pursuant to the mandates of the [WQCP] or the ESA to further fish and wildlife restoration," Plaintiffs maintain that such use "serves the primary purpose and effectuates the hierarchy of purposes set in section 3406(b)(2)."  (*Id.* at 7.)  Plaintiffs

33

maintain that the Ninth Circuit could not have intended to
emasculate the 800,000 AF limit by granting Interior "unfettered
discretion to exclude from its accounting of (b)(2) water any
water dedicated to fulfill environmental obligations emanating
from other statutes." (*Id.* at 8.)  This, they argue, would run
afoul of the cannon of statutory construction that requires
effect be given to every provision in a statute.[8]

Federal Defendants rejoin that Interior properly exercised
its discretion to designate the 159,200 AF as "Non-B2 Fishery
Actions" in late June and August/September 2004, because that
water did not serve the "primary purpose" of the CVPIA. (*See*
Doc. 658-3 at 24.)  Federal Defendants argue that the Ninth
Circuit's decision construed (b)(2) broadly to uphold the
agency's ability to carry out the CVPIA's "restoration mandate,"
holding that if "Interior were required to deduct some or all of
the water it uses for water quality and Endangered Species Act

_____

[8]    Federal Defendants and Environmental Plaintiffs argue
that Plaintiffs are merely resurrecting the same argument they
raised on appeal. (Doc. 685-3 at 27; Doc. 686 at 7.)  In some
places, Plaintiffs do appear to be retracing old ground.  For
example, Plaintiffs argue that by including uses to protect the
Delta and uses to meet post-1992 legal obligations as purposes
which must be counted toward the 800,000 AF limit, Congress
evidenced intent to have these counted. (Doc. 681 at 8.)  This
issue has already been ruled upon by the Ninth Circuit, which
held that, despite the inclusion as a CVPIA purpose the
satisfaction of post-1992 legal obligations, Interior
nevertheless has the discretion not to count water used to serve
those purposes, so long as doing so will further the hierarchy of
purposes.  For the most part, however, Plaintiffs raise novel
issues here, challenging the scope of Interior's discretion,
rather than whether Interior has any discretion at all, in light
of the CVPIA's (b)(2) and overall purposes.

purposes from the (b)(2) dedication," then the water needed to implement the restoration mandate could be relegated to a secondary role, or perhaps no role at all." 87 Fed. Appx. at 640.  That result, "would directly conflict with Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2)."  *Id.*  Federal defendants insist that the Court of Appeals' decision must be read as a command to Interior to ensure that it exercises its discretion in a manner that will not frustrate the primary purpose of fish, wildlife and habitat restoration.  This is a partial truth, as the 800,000 AF cap on CVP yield that must be annually dedicated to (b)(2) purposes is not discretionary and can only be reduced in times of water shortage.

Environmental Plaintiffs add that the primary purpose of the CVPIA is anadromous fish doubling and that Interior retains the discretion to refrain from counting actions that use CVP yield for other purposes if doing so would give effect to the hierarchy of purposes.  (Doc. 686 at 9.)  Environmental Plaintiffs emphasize that "since the Ninth Circuit has expressly held that Interior may -- indeed must -- prioritize (b)(2) water for the CVPIA's restoration mandate beyond mere compliance with the CVP's water quality obligations, there will be years in which the sum of the actions taken under Section 3406(b)(2), the WQCP, and the ESA will exceed 800,000 AF."  (*Id.* at 6.)  Environmental Plaintiffs maintain that "[t]here is nothing illegal or inappropriate about this.  Interior is required to provide water for fishery purposes under several statutes.  As the appellate court decided, Section 3406(b)(2) did not simply subsume the

1  CVP's water quality obligations.  Contrary to the position of

2  [the Authority], the 800,000 AF dedication is not a cap on the

3  CVP's environmental water obligations."  (*Id.*)

4          The parties all agree that under the Ninth Circuit's

5  decision, Interior retains some degree of discretion to refrain

6  from deducting water from the (b)(2) account if doing so will

7  give effect to the hierarchy of purposes in the CVPIA.  The

8  dispute in this case arises over the nature and extent of that

9  discretion.  The fundamental disagreement is, essentially, over

10 the scope and meaning of the phrase "primary purpose," as that

11 term is used in the Ninth Circuit's decision.

12              2.    The Scope of the "Primary Purpose" Language.

13         The Ninth Circuit explained in general that the "primary

14 purpose to which the 800,000 acre feet should be dedicated is the

15 implementation of 'fish, wildlife, and habitat restoration

16 purposes authorized by this title....'"[9] *Bay Institute,* 87 Fed.

17 Appx 639-40 (quoting CVPIA 3406(b)(2)).  Plaintiffs suggest that

18 the "primary purpose" includes <u>any</u> action designed to help fish,

19 while Environmental Plaintiffs and Federal Defendants suggest

20 that the "primary purpose" is the anadromous fish doubling

21 program set forth in section 3406(b)(1).  (Doc. 686 at 9; Doc.

22 696 at 19 n.3 (Federal Defendants "generally agree" with

23 Environmental Plaintiffs' position on this issue).)

24

25 ─────────────────────

26         [9]    The term "wildlife" must refer to species other than
   fish or its inclusion in the statute would be unnecessary and
27 illusory.  "Habitat" must refer to more than aquatic environments
   because wildlife other than aquatic species are expressly
28 delimited as protected by the primary purpose.

Section 3406(b)(2) describes the "primary purpose" as the implementation of the "fish, wildlife, and habitat restoration purposes authorized by this title...," referring to the entire CVPIA.  Therefore, according to the plain meaning of this text, any fish, wildlife and habitat restoration actions authorized by any part of the CVIPA may be relevant.

The CVPIA is organized into twelve sections as follows:

| | |
|---|---|
| 3401 – | Short Title |
| 3402 – | Purposes |
| 3403 – | Definitions |
| 3404 – | Limitation on Contracting and Contract Reform |
| 3405 – | Water Transfers, Improved Water Management and Conservation |
| 3406 – | Fish, Wildlife and Habitat Restoration |
| 3407 – | Restoration Fund (establishing fund to serve as a source of revenue for restoration activities) |
| 3408 – | Additional Authorities (authorizing various operational activities not directly related to fish, wildlife, and habitat restoration) |
| 3409 – | Environmental Review |
| 3410 – | Authorization of Appropriations |
| 3411 – | Compliance with State Water Law and Coordinated Operations Agreement |
| 3412 – | Extension of the Tehama-Colusa Canal Service Area |

Only section 3406 authorizes any fish, wildlife, and habitat restoration activities.  Section 3406(b), which is entitled "Fish

37

and Wildlife Restoration Activities," first directs the Secretary
of the Interior to "immediately upon enactment of this title"
"meet all obligations under State and Federal law, including but
not limited to the Federal Endangered Species Act, 16 U.S.C. §
1531, *et seq.*, and all decisions of the California Water
Resources Control board establishing conditions on applicable
licenses and permits for the project."  Plaintiffs maintain that
this reference to the ESA and SWRCB decisions reflects "Congress'
[] understanding that compliance with these requirements would
further fish and wildlife restoration."  (Doc. 690 at 13.)
Assuming, *arguendo*, Congress expressly included these uses in the
preamble to codify its belief that water used for ESA and SWRCB
purposes would further fish and wildlife restoration, this does
not necessarily mean Congress intended ESA requirements and SWRCB
decisions to be considered part of the "primary purpose" of the
CVPIA.  The CVPIA specifically limits the reach of its primary
purpose to those "fish, wildlife, and habitat restoration
purposes <u>authorized by this title</u>...."  A plain language reading
of this provision does not incorporate by reference all ESA
requirements and SWRCB decisions simply because Interior is
directed to comply with those statutes within section 3406(b).
Rather, this language refers only to those fish, wildlife, and
habitat restoration actions specifically enumerated in 3406(b).

     This conclusion is reinforced by the language of section
3406(b)(2), which, as explained by the Ninth Circuit's decision,
delineates multiple priorities.  Primacy is given to those "fish,
wildlife, and habitat restoration purposes and measures
authorized by [the CVPIA]."  Thereafter, Interior is directed by

the statute "to assist" the State in its "efforts to protect the waters of the San Francisco Bay Sacramento-San Joaquin Delta Estuary," and "to help" meet obligations imposed upon the CVP under State and Federal law, "including but not limited to additional obligations under the Federal Endangered Species Act...." § 3406(b)(2).

Section 3406(b) further directs and authorizes the Secretary of the Interior to implement several specific fish and wildlife restoration programs.[10]  First, section 3406(b)(1) directs Interior to develop a program that "makes all reasonable efforts to ensure that...natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period of 1967-1991...."  Environmental Plaintiffs suggest that this so called "fish doubling" requirement is the only restoration activity that should be considered a component of the "primary purpose."  However, neither the Ninth Circuit decision nor the "primary purpose" language in 3406(b)(2) specifically mention the anadromous fish doubling program or limit the "primary purpose" to that program.  In fact, there are

_____

[10]    The remaining sub-sections of section 3406 contain provisions requiring Interior to the develop comprehensive restoration plans for the San Joaquin and Stanislaus Rivers, § 3406(c); to provide water to wildlife refuges, § 3406(d); to investigate certain other opportunities for mitigation and restoration, § 3406(e); to report on project fishery impacts, § 3406(f); to develop models to evaluate the ecological and hydrologic effects of project operations, § 3406(g); and to enter into a cost-sharing agreement with the State of California, § 3406(h).  None of these sections on their own call for any operational changes that could impact (b)(2) accounting.

several other provisions in section 3406(b) that arguably require
the allocation of water for restoration purposes:

- Sections 3406(b)(4) and (b)(5) direct Interior to
  develop and implement programs to "mitigate" for
  fishery impacts associated with operations at the Tracy
  Pumping Plant and Contra Costa Canal Pumping Plant,
  respectively.
- Section 3406(b)(8) requires Interior to "make use of
  short pulses of increased water flows to increase the
  survival of migrating anadromous fish moving into and
  through the [Delta] and Central Valley rivers and
  streams."
- Section 3406(b)(9) directs Interior to develop and
  implement a program to eliminate "to the extent
  possible" losses of anadromous fish caused by the
  operation of any CVP storage or re-regulating facility.
- Section 3406(b)(12) requires that Interior develop and
  implement a comprehensive plan to "provide flows to
  allow sufficient spawning, incubation, rearing, and
  outmigration for salmon and steelhead from Whiskeytown
  Dam...."
- Section 3406(b)(18), directs Interior, if requested by
  the State of California, to implement management
  measures to restore the striped bass fishery in the
  Delta.
- Section 3406(b)(19) requires Interior to reevaluate
  operational criteria in order to maintain minimum
  carryover storage at Sacramento and Trinity River

**40**

1    reservoirs to "protect and restore the anadromous fish

2    of the Sacramento and Trinity Rivers...."[11]

3    _____

4    [11]    The remaining provisions in section 3406(b) do not
     direct Interior to undertake specific restoration activities that
5    could impact water releases and deliveries. Section 3406(b)(2),
     which contains the disputed 800,000 AF dedication, does not on
6    its own require any specific restoration actions.  Section
     3406(b)(3) requires that Interior develop and implement a program
7    "for the acquisition of a water supply to "supplement" the
     800,000 AF dedicated in (b)(2) and fulfill Interior's obligations
8    under section 3406(d)(2)(requiring the provision of firm water
     supplies to "maintain and improve wetland habitat areas" in
9    Central Valley National Wildlife Refuge System units, Central
     Valley State Wildlife Management Areas, and on the Grasslands
10   Resources Conservation District).  Section 3406(b)(5) requires
     installation and operation of a temperature control device at
11   Shasta Dam.  Section 3406(b)(10) requires that Interior develop
     and implement measures to minimize fish passage problems for
12   adult and juvenile anadromous fish at the Red Bluff Diversion
     Dam.  Section 3406(b)(11) requires rehabilitation and expansion
13   of the Coleman National Fish Hatchery.  Section 3406(b)(13)
     directs Interior to develop and implement a plan to restore and
14   replenish spawning gravel lost due the construction and operation
     of CVP dams.  Section 3406(b)(14) requires that interior develop
15   and implement a program which "provides for modified operations
     and new or improved control structures at the Delta Cross Channel
16   and Georgiana Slough during times when significant numbers of
     striped bass eggs, larvae, and juveniles approach the Sacramento
17   River intake to [those facilities]."  Section 3406(b)(15)
     requires construction and operation of a barrier at the head of
18   old river to "increase the survival of young out migrating
     salmon...in a manner that does not significantly impair the
19   ability of local entities to divert water."  Section 3406(b)(16)
     directs Interior to establish a comprehensive "assessment
20   program" to monitor fish and wildlife resources in the Central
     Valley and to assess the biological results and effectiveness of
21   actions implemented pursuant to [3406(b)]."  Section 3406(b)(17)
     requires that Interior develop and implement a program to resolve
22   fish passage problems at the Anderson-Cottonwood Irrigation
     District Diversion Dam as well as to resolve upstream stranding
23   problems associated with operation of that facility.  Section
     3406(b)(20) requires Interior's participation in an ongoing
24   program to mitigate for fishery impacts associated with the

25

26

27

28

41

1    Section 3406(b)(7) requires that the Secretary "meet flow

2  standards and objectives and diversion limits set forth in all

3  laws and judicial decisions" applicable to the CVP, specifically

4  referencing the "Agreement Between the United States and the

5  Department of Water Resources of the State of California for

6  Coordinated Operation of the Central Valley Project and the State

7  Water Project" dated May 20, 1985, as well as Public Law 99-546.

8  The language "flow standards and objectives and diversion limits"

9  is not defined.  This language raises several questions.  First,

10 did Congress mean to classify as "fish and wildlife restoration

11 activities" the "flow standards and objectives and diversion

12 limits" required by other statutes, agreements, and judicial

13 decisions?  The placement of this provision within section

14 3406(b), which is entitled "Fish and Wildlife Restoration

15 Activities," suggests that it so intended.  Second, assuming

16 Congress considered the external requirements to be restoration

17 activities, did Congress mean to incorporate all such "flow

18 standards and objectives and diversion limits," by reference,

19 transforming them into primary purpose measures?  As discussed

20 above, a plain language reading of the primary purpose language

21

22 _____

23 Hamilton City Pumping Plant.  Section 3406(b)(21) requires that
   Interior assist the state of California in efforts to develop and

24 implement measures to avoid losses of anadromous fish resulting
   from unscreened or inadequately screened diversions on the

25 Sacramento and San Joaquin Rivers.  Section 3406(b)(22) calls
   upon interior to provide incentives to encourage farmers to

26 participate in a program under which fields will be kept flooded
   during appropriate time periods for the purpose of providing

27 waterfowl habitat.  Finally, 3406(b)(23) contains an expired
   provision regarding the Trinity River Diversion.

28

("...for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title....") suggests that Congress intended only actions specifically authorized by the CVPIA to be considered "primary purpose" measures.

The "primary purpose" includes all those fish and wildlife restoration activities specifically described in section 3406(b). This includes water dedicated to accomplish the anadromous fish doubling goal set forth in section 3406(b)(1), but also includes water needed to accomplish any of the other specifically enumerated programs listed in section 3406(b) (e.g., 3406(b)(4), (5), (8), (9), (12), (18) & (19)). The structure and placement by Congress of these express provisions must be considered.

Environmental Plaintiffs suggest that additional language contained within 3406(b)(1) indicates Congress' intent to elevate the (b)(1) anadromous fish doubling program above any of these other fish and wildlife restoration programs specifically enumerated in 3406(b). In pertinent part, section 3406(b)(1) directs the Secretary of the Interior to:

> develop within three years of enactment and implement a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period of 1967-1991... Provided...That the programs and activities authorized by this section shall, when fully implemented, be deemed to meet the mitigation, protection, restoration, and enhancement purposes established by subsection 3406(a) of this title....
>
> (A) This program shall give first priority to measures which protect and restore natural channel and riparian habitat values through habitat restoration actions, modifications to Central Valley Project operations, and implementation of

43

> the supporting measures mandated by this subsection....
>
> (B) As needed to achieve the goals of this program, the Secretary is authorized and directed to modify Central Valley Project operations to provide flows of suitable quality, quantity, and timing to protect all life stages of anadromous fish, except that such flows shall be provided from the quantity of water dedicated to fish, wildlife, and habitat restoration purposes under paragraph (2) of this subsection; from the water supplies acquired pursuant to paragraph (3) of this subsection; and from other sources which do not conflict with fulfillment of the Secretary's remaining contractual obligations to provide Central Valley Project water for other authorized purposes....

§ 3406(b)(1).

There is some primacy implied by the positioning of section (b)(1) vis-a-vis (b)(2) and the other specific programs enumerated in (b)(3) through (b)(23). Moreover, (b)(1) is the only CVPIA program that specifically contains language authorizing Interior to "modify Central Valley Project operations." § 3406(b)(1)(B). Section (b)(1) is also the only specific program that contains language explaining that "such flows shall be provided from the quantity of water dedicated to fish, wildlife, and habitat restoration purposes under paragraph (2) of this subsection, i.e., the 800,000 AF; from the water supplies acquired pursuant to paragraph (3) of this subsection; and from other sources which do not conflict with fulfillment of the Secretary's remaining contractual obligations to provide Central Valley Project water for other authorized purposes." *Id.*[12]

_____

[12]   Section (b)(1)(A) expressly directs Interior to design the fish doubling program to meet not only the "fish, wildlife,

44

1    Although this is limiting language, its placement in (b)(1)

2  and not elsewhere within (b)(3) through (b)(23) implies that

3  (b)(1) is in a different category relative to the other

4  provisions of 3406(b).  The language also mandates that the water

5  as used for, inter alia, (b)(2) purposes, not come from other

6  sources that would conflict with Interior's remaining contractual

7  obligations, which includes agricultural contractors.

8    This case does not involve water use justified under

9  3406(b)(3) through (b)(23) and it is unnecessary to decide the

10  relative priority of these programs in relation to (b)(1)

11  programs.  To do so would constitute an improper advisory

12  opinion.

13    Under the Ninth Circuit Decision, Interior has discretion

14  not to count water used for any of the (b)(2) "secondary"

15  purposes, so long as that water is "needed" to effectuate the

16  "primary" restoration programs specifically enumerated in section

17  3406(b), including the fish doubling program contained within

18  3406(b)(1).[13]  The primary purpose language does not globally

19

20  and habitat restoration goals" of the CVPIA, but "other project

21  purposes" as well.  This expressly limits Interior's discretion
    to prevent it from ignoring such purposes.

22

23    [13]    Plaintiffs express a very legitimate concern that such
    an interpretation leaves too much room for discretion, thereby

24  allowing Interior to eviscerate the 800,000 AF limit.  For
    example, if 500,000 AF of water is needed in a particular year to

25  ensure that an ESA-listed species does not go extinct in the
    short term, this water would arguably not contribute to the

26  CVPIA's primary purpose.  Interior could, therefore, refrain from
    counting some or all of this 500,000 AF of water toward the

27  (b)(2) account if it reasonably concluded that more than 300,000
    AF was needed to effectively implement the CVPIA's primary

28

encompass every action that benefits fish.  Rather, it applies

only to those actions that support the specifically enumerated

fish and wildlife restoration programs contained within 3406(b).

      There is potential for overlap between the "primary" purpose

and actions taken pursuant to the fisheries purposes of the WQCP

and ESA.  The parties point to language within the CVPIA and

various agency documents that acknowledge such overlap.  For

example, 3406(b)(1)(c) provides:

> The Secretary shall cooperate with the State of
> California to ensure that, <u>to the greatest degree
> practicable</u>, the specific quantities of yield dedicated
> to and managed for fish and wildlife purposes under
> this title are credited against any additional
> obligations of the Central Valley Project which may be
> imposed by the State of California following enactment
> of this title, including but not limited to increased
> flow and reduced export obligations which may be
> imposed by the California State Water Resources Control
> Board in implementing San Francisco Bay/Sacramento-San
> Joaquin Delta Estuary standards pursuant to the review
> ordered by the California Court of Appeals in United
> States v. State Water Resources Control Board, 182
> Cal.App.3d 82 (1986), and that, to the greatest degree
> practicable, the programs and plans required by this
> title are developed and implemented in a way that
> avoids inconsistent or duplicative obligations from
> being imposed upon Central Valley Project water and
> power contractors.

(Emphasis added.)[14]

---

restoration mandate. By logical extension, if all CVP yield were
needed to satisfy ESA and WCQP purposes, there would be no water
for CVP contractors.  In practice, however, Interior has only
exceeded the 800,000 AF limit on the one occasion that provides
the basis for this litigation.  Interior maintains that unforeseen
circumstances caused that single exceedence.

[14]    Plaintiffs suggest that this language "expressly
contemplates that the same dedication of water can satisfy both
the 'fish and wildlife' purposes of the CVPIA and requirements
imposed on the CVP by the SWRCB to meet the requirements of the
[WQCP]."  (Doc 681. at 9.)  Therefore, Plaintiffs argue, it is

1    Interior recognized the potential for this overlap in its

2 December 2003 Guidance, which provides:

3         [A]ctions taken pursuant to the 1995 Water Quality
          Control Plan and State Water Resources Control Board
4         Decision D-1641 ("the 1995 WQCP") involve the
          dedication and management of Central Valley Project
5         yield for long-term fishery beneficial use and
          protection.  Such actions are not taken to help meet
6         agricultural or municipal and industrial water quality
          standards that are set forth in the 1995 WQCP.  <u>Most of</u>
7         <u>the fishery beneficial uses and objectives under the</u>
          <u>1995 WQCP and in Reclamation's water rights permits</u>
8         <u>help fulfill the fish, wildlife, and habitat</u>
          <u>restoration purposes and measures authorized by Section</u>
9         <u>3406(b).  Consistent with the June 3, 2003 Ninth</u>
          <u>Circuit decision, much of the (b)(2) water that is</u>
10        <u>dedicated and managed annually to help meet fishery</u>
          <u>beneficial use and protection objectives of the 1995</u>
11        <u>WQCP serves Section 3406(b)(2)'s "primary purpose" of</u>
          <u>fish, wildlife, and habitat restoration.  Therefore the</u>
12        <u>implementation of Section 3406(b)(2) in accordance with</u>
          <u>the May 9, 2003 Decision and with this supplemental</u>
13        <u>guidance effectuates the "hierarchy of purposes" in</u>
          <u>Section 3406(b)(2)</u>.
14
   (AR 2156-57 (emphasis added).)[15]
15

16   _____

17 appropriate to count WQCP and ESA water toward the (b)(2)
   dedication.  However, the language of section 3406(b)(1)(c)
18 recognizes that the overlap is not comprehensive, by qualifying
   the Secretary's duty to avoid duplicative obligations only to the
19 "greatest degree practicable."

20        [15]    Plaintiffs suggest that this language means that
21 counting WQCP and ESA uses toward the 800,000 AF limit "cannot
   logically be considered contrary to the primary purpose."  (Doc
22 681 at 10.)  But, the December 2003 Guidance's statement that
   "most" of the water dedicated to meet the fishery and beneficial
23 use and protection objectives of the WQCP also serve the CVPIA's
   "primary purpose," impliedly acknowledges that some portion of
24 water dedicated to meet WQCP goals does <u>not</u> serve the primary
   purpose.  Elsewhere in the administrative record, Interior
25 specifically stated that "only meeting the WQCP and post-1992 ESA
   requirements may not be sufficient to meet the anadromous fish
26 doubling goal and other restoration purposes and measures
   included in CVPIA."  (AR 2326 (response 6j).)  According to the
27 Ninth Circuit Decision, Interior has the discretion to exclude
28

1    In practice, many actions taken to fulfill the fishery
2  beneficial uses and objectives of the WQCP and/or actions taken
3  to comply with the ESA may serve the primary purpose of the
4  CVPIA.   In keeping with the general structure of the CVPIA's
5  language, if the "primary" purpose of any action taken under the
6  WQCP and/or the ESA is to support or effectuate a "primary
7  purpose" program, such action must be counted toward the (b)(2)
8  account.   Environmental Plaintiffs advance a helpful definition
9  of the term "primary," the ordinary meaning of which is
10 "predominant," of "first importance," or "principal."  *See Malat*
11 *v. Riddell*, 383 U.S. 569, 572 (1966).   Applying this definition,
12 if an action taken under the WQCP and/or the ESA predominantly
13 contributes to one of the primary purpose programs (e.g., fish
14 doubling), it must be counted toward the 800,000 AF limit.
15 Interior retains the discretion not to count other secondary
16 actions, so long as doing so is necessary to give effect to the
17 hierarchy of purposes.

18         3.   Did Interior Abuse Its Discretion In This Case?

19    Federal defendants maintain that Interior follows prescribed
20 procedures to dedicate and manage the (b)(2) water account,
21 including the development of numerous forecasts designed to help
22 plan and schedule (b)(2) actions.   Interior maintains that the
23 events in the 2004 (b)(2) accounting year took the agency by
24 surprise, requiring unexpected changes in operations.   Interior
25 claims it worked "carefully and conscientiously to stay within

26

27
28 WQCP and ESA actions that do not serve the primary purpose from
   the (b)(2) account.

the statutory ceiling" and has exercised its discretion to refrain from crediting the (b)(2) water account only in exceptional circumstances.

However, none of the guidance documents presented in the Administrative Record directly identify or explain the procedures Interior must follow either in a "normal" (b)(2) year or an "exceptional" one in which the 800,000 AF limit may need to be exceeded.  The May 9, 2008 Decision comes the closest, stating:

> Interior will account for the total amount of CVP water costs associated with meeting the WQCP obligations and ESA obligations imposed after enactment of CVPIA against the annual (b)(2) allocation, up to the balance of (b)(2) water remaining at the time the cost is incurred.

(AR 2146 (emphasis added).)  This Decision, however, predates the Ninth Circuit's ruling on the issue.  Federal Defendants therefore assert that there is no formal administrative decision in this case to which *Chevron* deference is owed.  (*See* Doc. 696, at 13-14.)  Instead, the parties stipulated to allow for the submission of expert declarations to help explain the contents of this "rather unusual administrative record to the court."  (*Id.* at 14.)

### a.   Did Interior Abuse Its Discretion With Respect to the June Actions?

From June 17 through June 24, 2004 Interior allocated 9,100 AF to Non-B2 Fishery Actions.  The daily accounting for June 17 through June 30, 2004 indicates that water costs were being incurred for changes in operations at Nimbus, Clear Creek, and New Melones.  (First Fujitani Decl. at ¶17.)  Only those costs incurred at Nimbus and New Melones were accounted for as Non-B2 Fishery Actions.  (*Id.*)  A draft document entitled "Summary of

(b)(2) Fish Actions for Water Year 2004," dated December 1, 2004, specifies that releases from Nimbus during the "latter part" of June were "to meet Delta demands."[16]  (AR 1521.)  Mr. Fujitani states that releases from Nimbus were required to meet the June Delta outflow standard.  (First Fujitani Decl. at ¶17.)[17] Releases from New Melones were needed to meet San Joaquin River flow requirements at Vernalis.  (*Id*.)  Interior did not count these releases as "(b)(2)" releases, but instead as "Non-B2 Fishery Actions."  (*Id*.)

The question presented is:  Did either of these actions predominantly contribute to one of the (b)(2) primary purpose programs (e.g., fish doubling)?  The Delta outflow standard was promulgated as part of the 1995 WQCP (D-1641).  The stated purpose of the outflow standard is to protect "estuarine habitat for anadromous fishes and other estuarine-dependent species."

---

[16]   Mr. Snow suggests in his First Declaration that the June 2004 releases were "to provide suitable habitat for upstream migration, spawning, egg incubation, rearing and outmigration for anadromous fish, including listed runs of Chinook salmon and steelhead trout, and improved conditions for estuarine species by helping to meet WQCP objectives," citing a document entitled "Summary of (b)(2) Fish Actions for Water Year 2004."  (AR 1521.) However, the quoted passage referred to actions taken in the early part of June.  That same document later explains that in the later part of the month, releases from Nimbus were increased to "approximately 2,500 cfs to meet Delta demands," which the court infers were for exports.  (*Id*.)

[17]   Although no party attempts to reconcile these slightly different explanations for releases from Nimbus, they appear to be consistent (i.e., without increased releases from Nimbus, Delta demands would result in exceedance of the outflow standard).

1  (1995 WQCP at 15.)[18]   The Vernalis flow requirement on the San

2  Joaquin River, along with similar flow requirement on the

3  Sacramento River, originate in the WQCP.   The stated purpose of

4  the Vernalis flow requirements are "to provide attraction and

5  transport flows and suitable habitat for various life stages of

6  aquatic organisms, including Delta smelt and chinook salmon."

7  (*Id*. at 15.)

8      Although both of these standards are to benefit anadromous

9  fish species, they do not specifically identify an intent to

10  support the fish doubling goal (or any other specifically-

11  enumerated 3406(b) program).   In fact, the WQCP contains a <u>wholly

12  separate</u> "narrative objective" for salmon doubling, which

13  provides: "Water quality conditions shall be maintained, together

14  with [other] measures in the watershed, sufficient to achieve a

15  doubling of natural production of chinook salmon from the average

16  production of 1967-1991, consistent with the provisions of State

17  and federal law."   (*Id*. at 15 & 18.)   The existence of this

18  separate provision, directed at anadromous fish doubling,

19  suggests that neither the Delta outflow objective nor the

20  Vernalis flow requirement were intended to achieve the CVPIA fish

21  doubling purpose.   Actions taken to comply with the Delta outflow

22  objective and/or the Vernalis flow requirement do not

23  _____

24      [18]   The first page of the 1995 WQCP is included in the
Administrative Record at AR 4490.   It is not clear whether

25  Federal Defendants intended to include the entire document in the
record.   Plaintiffs attached the entire document to their request

26  for judicial notice.   (Doc. 693.)   As the WQCP is a public record
subject to judicial notice, *see United States v. S. Cal. Edison

27  Co.*, 300 F. Supp. 2d 964, 973 (E.D. Cal. 2004), Plaintiffs

28  request is GRANTED.

"predominantly" contribute to primary purpose programs. Interior did not abuse its discretion in excluding these actions that consumed approximately 9,000 AF of CVP yield from (b)(2) accounting.

> ### b. Did Interior Abuse Its Discretion With Respect to the August/September Actions?

In August and September 2004, the CVP exported 159,000 AF less than it otherwise would have under base case conditions. For both August and September, the "Summary of (b)(2) Fish Actions for Water Year 2004" indicates:

> CVP exports were not curtailed for fishery purposes. However, actual exports were reduced from base case exports due to WQCP elimination of replacement pumping.

(AR 1522-23.)

The baseline for (b)(2) accounting in the Delta includes water quality obligations under D-1485, which was superceded in 1995 by the WQCP (D-1641). (*See* AR 2141.) D-1485 includes a requirement that the mean monthly pumping by the CVP may not exceed 3,000 cfs in May and June. (First Fujitani Decl., at ¶18.) D-1485 identifies young striped bass as the beneficial use protected by the reduced diversions in May and June. (*Id.*) The Coordinated Operations Agreement between DWR and the Bureau permitted the CVP to use DWR's Banks pumping plant to replace any CVP pumping lost in May and June. (*Id.*) This CVP pumping at Banks was known as "replacement pumping." (*Id.*) Historically, Reclamation utilized Banks for replacement pumping July through November. (*Id.*) Therefore, in the baseline forecast for 2004, Reclamation assumed that some replacement pumping would take place in August and September. (*Id.*)

1    However, D-1485's 3,000 cfs pumping limit and the related

2  provision for replacement pumping were not continued under the

3  subsequent D-1641.  Instead, they were replaced by the

4  export/import ratio, Delta outflow, and salinity criteria

5  contained in D-1641, in addition to any other pumping

6  restrictions imposed in accordance with the ESA.  (Snow Decl. at

7  ¶17.)  Interior accounts for any actions taken to comply with D-

8  1641 and post-1992 ESA requirements by evaluating whether those

9  requirements cause departures from the D-1485 baseline.

10    The actual accounting for the months of May and June begins

11  with a baseline pumping rate of 3,000 cfs, reflecting the pumping

12  restriction contained in D-1485.  (Snow Decl. at ¶21.)

13  Curtailments that lowered pumping during May and June below the

14  3,000 cfs baseline were counted toward the (b)(2) account at that

15  time (i.e., in May or June).  However, Interior did not

16  contemporaneously account for the amount of replacement pumping

17  (i.e., the difference between capacity and the 3,000 cfs limit)

18  that would have accumulated each day under D-1485.  Because that

19  "replacement pumping" was historically scheduled for

20  implementation in August and September, it became part of the

21  August and September baseline.  It is the Bureau's practice to

22  account for any curtailments of that replacement pumping at the

23  time the replacement pumping was scheduled to take place (i.e.,

24  in August and September).  (*See* Fujitani Decl. at ¶19.)

25  Plaintiffs point to no authority suggesting that this approach to

26  accounting, a complex process that falls within the agency's

27  discretion, is unreasonable.  Plaintiffs have not argued that

28  this accounting constitutes a prohibited offset or reset.

1    Daily fishery costs for August and September are calculated
2    by taking the baseline operations forecast for each day on which
3    the replacement pumping would have occurred, and then subtracting
4    the total pumping at Banks and Jones.  For example, on August 20,
5    2004, baseline pumping was predicted to be 7,210 cfs, while
6    actual pumping at Jones and Banks was 5,902 cfs, for a difference
7    of 1,308, which was counted as the fishery cost for that day.
8    (*Id.*)  When these fishery costs were incurred in August and
9    September, no (b)(2) water remained, so Interior refrained from
10   counting these losses as (b)(2) actions.  (*Id.* at ¶20.)

11       Again, the key question is:  Did Interior's accounting in
12   for August and September actions fail to count uses that
13   predominantly contributed to one of the primary purpose programs,
14   e.g., fish doubling?  The record evidence on this issue is
15   essentially non-existent.  The final (b)(2) accounting
16   conclusorily states that the reduction in pumping that occurred
17   in August and September was accounted for as a "non-B2 fishery
18   action."  (AR 3185.)  The Federal Defendants rely heavily on the
19   December 1, 2004 "Summary of (b)(2) Fish Actions for Water Year
20   2004," which states that, in August and September 2004, with
21   respect to actions in the delta, "CVP Exports were not curtailed
22   for fishery purposes.  However, actual exports were reduced from
23   base case, due to WQCP elimination of replacement pumping."  (AR
24   1522-23.)  Federal Defendants also point to a table entitled
25   "Water Year 2004 Fishery Action Costs (using DOI's May '03 (b)(2)
26   Decision metrics)," which labels the pumping foregone in August
27   and September as "Replacement Pumping Foregone + Cross Valley
28   Delivery Difference" and classifies that water for accounting

**54**

1  purposes as "WQCP/ESA Actions that contribute to SECONDARY
2  PURPOSE."  (AR 2565.)

3       The record contains absolutely no explanation as to why the
4  "WQCP elimination of replacement pumping" or "Replacement Pumping
5  Foregone" is classified as a non-(b)(2), or "secondary purpose"
6  action.  It is acknowledged by all sides in this case that there
7  is some overlap between WQCP uses and primary purpose uses.  For
8  example, the "Water Year 2004 Fishery Action Costs (using
9  Interior's May '03 (b)(2) Decision metrics)" table indicates that
10 a certain type of WQCP use, namely "Delta Export Reductions (VAMP
11 & Post VAMP)" "contribute" to the primary purpose.  (AR 2565.)
12 In order to lawfully exercise the discretion afforded the Federal
13 Defendants by the Ninth Circuit's decision, the record must, at a
14 bare minimum, provide a basis for understanding why the agencies
15 have classified actions taken pursuant to the WQCP and/or the ESA
16 as "secondary" rather than "primary" (b)(2) purpose actions.  The
17 WQCP eliminated replacement pumping in favor of an alternative
18 regulatory scheme.  In August and September 2004, water that
19 would have been pumped under the baseline (D-1485) scenario was
20 not pumped, presumably because the new (i.e., post- CVPIA) WQCP
21 requirements demanded that pumping be curtailed below the
22 baseline level.  The record does not explain which WQCP
23 requirements triggered the curtailments in these months, making
24 it impossible to determine whether the curtailments served a
25 primary purpose.[19]

26

27       [19]  Although normally judicial review is confined to the
28 administrative record, there may be circumstances to justify

1   Interior did not sufficiently explain the reasons for its

2   actions in August and September 2004.  This is a failure of

3   proof, which makes its decision arbitrary and capricious.  On

4   this record, Plaintiffs are entitled to summary judgment as to

5   the August and September actions.

6   Plaintiffs also seek injunctive relief.  In this case, such

7   relief can only be prospective.  However, without further

8   evidence, there is no reason to believe that Interior will not

9   follow the law and apply Section 3406(b)(2) in accordance with

10   this decision.  Plaintiffs request for injunctive relief is

11   DENIED WITHOUT PREJUDICE.

12

13                    V.   CONCLUSION

14   What also remains unaddressed is the unambiguous language of

15   the CVPIA and subsection (b)(2).  The statute was enacted to

16   assure that fish protection and other environmental goals

17   received annual protection and advancement.  The law started from

18   the premise that the CVP, a multi-purpose project, has a limited

19   _____

20   expanding the record or permitting discovery.  The broadest
     exception to the rule that review is to be restricted to the
21   record certified by the agency is the one which permits expansion
     of the record when necessary to explain agency action.  When
22   there is "such a failure to explain administrative action as to
     frustrate effective judicial review," a court may receive from
23   the agency, either through affidavits or testimony, "such
     additional explanations of the reasons for the agency decision as
24   may prove necessary."  *Public Power Council v. Johnson*, 674 F.2d
     791, 793-94 (9th Cir. 1982)(quoting *Camp v. Pitts*, 411 U.S. 138,
25   143 (per curiam)).  Here, Federal Defendants were given ample
     opportunity to explain the record with expert declarations, all
26   of which failed to adequately explain the August and September
     actions.
27

28

1  water supply available in any given water year.  The Ninth

2  Circuit gave predominant and exclusive effect to (b)(2)'s primary

3  purpose by interpreting Interior's discretion as unlimited, to

4  not count toward the 800 TAF account, ESA, WQCP and related uses

5  of CVP yield.  This leaves Interior with unlimited discretion to

6  undermine other statutory non-environmental CVP water purposes.

7  This does not appear to be a fair or reasonable interpretation of

8  the CVPIA.  The Environmental Plaintiffs responsibly recognized

9  this at oral arguments, when they avowed that they do not seek to

10  use all CVP annual yield for environmental purposes.

11       For the reasons set forth above:

12       (1) Plaintiffs have standing to bring this suit;

13       (2) Federal Defendants' motion to dismiss the claims on

14  mootness grounds is DENIED;

15       (3) Plaintiffs' motion for summary judgment is DENIED as to

16  the June actions, but GRANTED as to the August and September

17  actions.

18       (4) Federal Defendants' cross-motion for summary judgment,

19  joined by Environmental Plaintiffs, is GRANTED as to the June

20  actions, but DENIED as to the August and September actions.

21       (5) Plaintiffs' request for injunctive relief is DENIED

22  WITHOUT PREJUDICE.

23

24  SO ORDERED

25  DATED:  September 19, 2008

26                          /s/ Oliver W. Wanger
                          Oliver W. Wanger
27                     United States District Court

28