UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS & DELTA-MENDOTA WATER AUTHORITY AND WESTLANDS WATER DISTRICT,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>          Defendants. | 1:97-CV-6140 OWW DLB<br>1:98-CV-5261 OWW DLB<br><br>MEMORANDUM DECISION RE MOTION FOR RECONSIDERATION (DOC. 715) |
| SAVE SAN FRANCISCO BAY Assoc., *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>          Defendants. | |

I.  INTRODUCTION

     Before the court for decision is San Luis & Delta-Mendota Water Authority ("Authority") and Westlands Water District's ("Westlands")(collectively, "Plaintiffs") motion for reconsideration of the September 19, 2008 Corrected Memorandum

Decision and Order granting in part and denying in part

cross-motions for summary judgment.  Doc. 715, filed Nov. 18.

2008.  Stockton East Water District, Plaintiff-in-Intervention,

joins this motion.  Doc. 719, filed Nov. 21 2008.


## II.  BACKGROUND

A.  Statutory Text.

This case concerns the statutory text of CVPIA section

3406(b)(2):

> (b) FISH AND WILDLIFE RESTORATION ACTIVITIES.--The
> Secretary [of the Interior], immediately upon the
> enactment of this title, shall operate the Central
> Valley Project to meet all obligations under state and
> Federal law, including but not limited to the Federal
> Endangered Species Act, 16 U.S.C. 1531, et seq., and
> all decisions of the California State Water Resources
> Control Board establishing conditions on applicable
> licenses and permits for the project.  The Secretary,
> in consultation with other State and Federal agencies,
> Indian tribes, and affected interest, is further
> authorized and directed to:
>
> ***
>
> (2) upon enactment of this title dedicate and manage
> annually eight hundred thousand acre-feet of Central
> Valley Project yield for the primary purpose of
> implementing the fish, wildlife, and habitat
> restoration purposes and measures authorized by this
> title; to assist the State of California in its efforts
> to protect the waters of the San Francisco
> Bay/Sacramento-San Joaquin Estuary; and to help meet
> such obligations as may be legally imposed upon the
> Central Valley Project under state or federal law
> following the date of enactment of this title,
> including but not limited to additional obligations
> under the federal Endangered Species Act....

Pub. L. No. 102-575, § 3406(b)(2), 106 Stat. 4700, 4714 (1992).


B.  Prior District Court and Ninth Circuit Rulings.

This (b)(2) language has been the subject of a series of

2

protracted lawsuits, culminating in orders in these consolidated cases at the district and appellate court levels.  As those decisions comprehensively recount this history, only a brief recap is necessary.

The CVPIA took effect October 31, 1992.  In 1998, Plaintiffs challenged Federal Defendants' October 5, 1999 "Final Decision on Implementation of Section 3406(b)(2)...," contending that Federal Defendants were required to credit against the 800,000 AF allocation of CVP yield all water used to satisfy either the 1995 Water Quality Control Program for the San Francisco Bay/ Sacramento-San Joaquin Estuary ("1995 WQCP") or post-CVPIA Endangered Species Act ("ESA") requirements.  *See* Doc. 466 at 26. The district court granted Plaintiffs' motion for summary judgment, concluding: "[A]s a matter of law, [the statutory] language is not ambiguous -- water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and must be charged against the 800 TAF [thousand acre-feet] (b)(2) mandate if so used."  *Id*. at 33.  The district court further found that to "hold otherwise would render the 800 TAF figure superfluous."  *Id.* at 35.  On March 20, 2002, partial final judgment was entered in favor of Plaintiffs on that claim, and the issue was certified for interlocutory appeal to the Ninth Circuit.  Doc. 491 at 4.

On appeal, Environmental Plaintiffs argued that the district court "improperly elevated the subordinate purpose of the (b)(2) dedication over the primary purpose."  Envt'l Appellants' Opening Brief, 2002 WL 32123196 *36 (9th Cir. Dec. 23, 2002).  In response, Plaintiffs argued that "the plain words of the statute

dictate and Congress intended that all water used to assist the
State in protection of the Bay/Delta, or to meet obligations
(including ESA obligations) legally imposed upon the CVP under
State or Federal law following the date of enactment of CVPIA,
would be counted toward the 800,000 acre-feet limit."
Appellants' Brief in Answer to Envt'l Appellants' Opening Brief,
2003 WL 21471613 *27, (9th Cir. Jan. 30, 2003).  In reply,
Environmental Plaintiffs emphasized that "the CVPIA cannot defeat
the statute's specific and non-discretionary directions to
Interior to use the 800,000 AF for the 'primary purpose' of
implementing the CVPIA's new restoration measures, and to achieve
the CVPIA's salmon doubling mandate."  Envt'l Appellants' Reply
Brief, 2003 WL 21471615 *13 (9th Cir. Feb. 18, 2003).

        The Ninth Circuit, in a ruling initially issued June 3, 2003
and amended January 23, 2004, affirmed the district court's
partial final judgment on four of five issues, but reversed
regarding (b)(2) accounting discretion:

                The district court erred in concluding that Interior
                lacks discretion to refrain from crediting the amount
                of Project yield actually used for any (b)(2) purpose
                against the designated 800,000 acre feet of Project
                yield. To hold otherwise would defeat the primary
                purpose for which the 800,000 acre feet were
                designated-fish, wildlife, and habitat restoration.
                Section 3406(b)(2) provides that the "primary purpose"
                to which the 800,000 acre feet should be dedicated is
                the implementation of "fish, wildlife, and habitat
                restoration purposes authorized by this title..."
                Section 3406(b)(2) also provides that the 800,000 acre
                feet may be used to "help" meet obligations under the
                Endangered Species Act and to "assist" in meeting water
                quality standards. If Interior were required to deduct
                some or all the water it uses for water quality and
                Endangered Species Act purposes from the (b)(2)
                dedication, the water needed for implementation of the
                Improvement Act's restoration mandate could be
                relegated to a secondary role, or perhaps no role at
                all. Such a scenario would directly conflict with the

                                    4

1          Interior's mandate to give effect to the hierarchy of
2          purposes established in Section 3406(b)(2)

*Bay Institute of San Francisco v. United States*, 87 Fed. Appx.
3
637 at 639-40 (9th Cir. 2004)(emphasis added).
4

5
          C.   The September 19, 2008 Ruling.
6
7     The September 19, 2008 Memorandum Decision summarizes the

8   parties arguments on summary judgment as follows:

9          Plaintiffs assert that "primary purpose" should be
           interpreted broadly, to include the 159,200 AF
10         designated as "Non-B2 Fishery Actions" in late June and
           August/September 2004, because those actions benefitted
11         fish.  (Doc. 681 at 9.)  They suggest that any water
           used to meet WQCP and/or ESA purposes must be counted
12         <u>unless</u> doing so would <u>not</u> serve any fish, wildlife, and
           habitat restoration purposes, <u>or</u> if counting the water
13         toward the 800,000 AF limit would "significantly
           impair" the primary restoration purposes.  (*Id.*)
14         However, when "water is used pursuant to the mandates
           of the [WQCP] or the ESA to further fish and wildlife
15         restoration," Plaintiffs maintain that such use "serves
           the primary purpose and effectuates the hierarchy of
16         purposes set in section 3406(b)(2)."  (*Id.* at 7.)
           Plaintiffs maintain that the Ninth Circuit could not
17         have intended to emasculate the 800,000 AF limit by
           granting Interior "unfettered discretion to exclude
18         from its accounting of (b)(2) water any water dedicated
           to fulfill environmental obligations emanating from
19         other statutes."  (*Id.* at 8.)  This, they argue, would
           run afoul of the cannon of statutory construction that
20         requires effect be given to every provision in a
           statute.

21         Federal Defendants rejoin that Interior properly
           exercised its discretion to designate the 159,200 AF as
22         "Non-B2 Fishery Actions" in late June and
           August/September 2004, because that water did not serve
23         the "primary purpose" of the CVPIA.  (*See* Doc. 658-3 at
           24.)  Federal Defendants argue that the Ninth Circuit's
24         decision construed (b)(2) broadly to uphold the
           agency's ability to carry out the CVPIA's "restoration
25         mandate," holding that if "Interior were required to
           deduct some or all of the water it uses for water
26         quality and Endangered Species Act purposes from the
           (b)(2) dedication," then the water needed to implement
27         the restoration mandate could be relegated to a
           secondary role, or perhaps no role at all."  87 Fed.
28         Appx. at 640.  That result, "would directly conflict

                                  5

1    with Interior's mandate to give effect to the hierarchy
     of purposes established in Section 3406(b)(2)."  *Id.*
2    Federal defendants insist that the Court of Appeals'
     decision must be read as a command to Interior to
3    ensure that it exercises its discretion in a manner
     that will not frustrate the primary purpose of fish,
4    wildlife and habitat restoration.  This is a partial
     truth, as the 800,000 AF cap on CVP yield that must be
5    annually dedicated to (b)(2) purposes is not
     discretionary and can only be reduced in times of water
6    shortage.

7    Environmental Plaintiffs add that the primary purpose
     of the CVPIA is anadromous fish doubling and that
8    Interior retains the discretion to refrain from
     counting actions that use CVP yield for other purposes
9    if doing so would give effect to the hierarchy of
     purposes.  (Doc. 686 at 9.)  Environmental Plaintiffs
10   emphasize that "since the Ninth Circuit has expressly
     held that Interior may -- indeed must -- prioritize
11   (b)(2) water for the CVPIA's restoration mandate beyond
     mere compliance with the CVP's water quality
12   obligations, there will be years in which the sum of
     the actions taken under Section 3406(b)(2), the WQCP,
13   and the ESA will exceed 800,000 AF."  (*Id.* at 6.)
     Environmental Plaintiffs maintain that "[t]here is
14   nothing illegal or inappropriate about this.  Interior
     is required to provide water for fishery purposes under
15   several statutes.  As the appellate court decided,
     Section 3406(b)(2) did not simply subsume the CVP's
16   water quality obligations.  Contrary to the position of
     [the Authority], the 800,000 AF dedication is not a cap
17   on the CVP's environmental water obligations."  (*Id.*)

18   The parties all agree that under the Ninth Circuit's
     decision, Interior retains some degree of discretion to
19   refrain from deducting water from the (b)(2) account if
     doing so will give effect to the hierarchy of purposes
20   in the CVPIA.  The dispute in this case arises over the
     nature and extent of that discretion.  The fundamental
21   disagreement is, essentially, over the scope and
     meaning of the phrase "primary purpose," as that term
22   is used in the Ninth Circuit's decision.

23   Doc. 711 at 33-36 (footnotes omitted)(emphasis in original).

24       The September 19 Decision defines the scope and meaning of

25   the phrase "primary purpose":

26   The Ninth Circuit explained in general that the
     "primary purpose to which the 800,000 acre feet should
27   be dedicated is the implementation of 'fish, wildlife,
     and habitat restoration purposes authorized by this
28   title....'"  Bay Institute, 87 Fed. Appx. 639-40

                                 **6**

1   (quoting CVPIA 3406(b)(2)).  Plaintiffs suggest that
    the "primary purpose" includes any action designed to
2   help fish, while Environmental Plaintiffs and Federal
    Defendants suggest that the "primary purpose" is the
3   anadromous fish doubling program set forth in section
    3406(b)(1).  (Doc. 686 at 9; Doc. 696 at 19 n.3
4   (Federal Defendants "generally agree" with
    Environmental Plaintiffs' position on this issue).)
5
                          ***
6
    The "primary purpose" includes all those fish and
7   wildlife restoration activities specifically described
    in section 3406(b).  This includes water dedicated to
8   accomplish the anadromous fish doubling goal set forth
    in section 3406(b)(1), but also includes water needed
9   to accomplish any of the other specifically enumerated
    programs listed in section 3406(b) (e.g., 3406(b)(4),
10  (5), (8), (9), (12), (18) & (19)).  The structure and
    placement by Congress of these express provisions must
11  be considered.

12                        ***

13  Under the Ninth Circuit Decision, Interior has
    discretion not to count water used for any of the
14  (b)(2) "secondary" purposes, so long as that water is
    "needed" to effectuate the "primary" restoration
15  programs specifically enumerated in section 3406(b),
    including the fish doubling program contained within
16  3406(b)(1).  <u>The primary purpose language does not
    globally encompass every action that benefits fish.
17  Rather, it applies only to those actions that support
    the specifically enumerated fish and wildlife
18  restoration programs contained within 3406(b)</u>.

19  *Id.* at 36, 43, 45 (emphasis added).

20      The Decision recognized that there is "potential for overlap

21  between the 'primary' purpose and actions taken pursuant to the

22  fisheries purposes of the WQCP and ESA."

23          For example, 3406(b)(1)(c) provides:

24              The Secretary shall cooperate with the State of
                California to ensure that, <u>to the greatest degree
25              practicable</u>, the specific quantities of yield
                dedicated to and managed for fish and wildlife
26              purposes under this title are credited against any
                additional obligations of the Central Valley
27              Project which may be imposed by the State of
                California following enactment of this title,
28              including but not limited to increased flow and

                                7

reduced export obligations which may be imposed by the California State Water Resources Control Board in implementing San Francisco Bay/Sacramento-San Joaquin Delta Estuary standards pursuant to the review ordered by the California Court of Appeals in *United States v. State Water Resources Control Board*, 182 Cal. App. 3d 82 (1986), and that, to the greatest degree practicable, the programs and plans required by this title are developed and implemented in a way that avoids inconsistent or duplicative obligations from being imposed upon Central Valley Project water and power contractors.

(Emphasis added.)

Interior recognized the potential for this overlap in its December 2003 Guidance, which provides:

[A]ctions taken pursuant to the 1995 Water Quality Control Plan and State Water Resources Control Board Decision D-1641 ("the 1995 WQCP") involve the dedication and management of Central Valley Project yield for long-term fishery beneficial use and protection. Such actions are not taken to help meet agricultural or municipal and industrial water quality standards that are set forth in the 1995 WQCP. Most of the fishery beneficial uses and objectives under the 1995 WQCP and in Reclamation's water rights permits help fulfill the fish, wildlife, and habitat restoration purposes and measures authorized by Section 3406(b). Consistent with the June 3, 2003 Ninth Circuit decision, much of the (b)(2) water that is dedicated and managed annually to help meet fishery beneficial use and protection objectives of the 1995 WQCP serves Section 3406(b)(2)'s "primary purpose" of fish, wildlife, and habitat restoration. Therefore the implementation of Section 3406(b)(2) in accordance with the May 9, 2003 Decision and with this supplemental guidance effectuates the "hierarchy of purposes" in Section 3406(b)(2).

(AR 2156-57 [].)

In practice, many actions taken to fulfill the fishery beneficial uses and objectives of the WQCP and/or actions taken to comply with the ESA may serve the primary purpose of the CVPIA. In keeping with the general structure of the CVPIA's language, if the "primary" purpose of any action taken under the WQCP and/or the ESA is to support or effectuate a "primary purpose" program, such action must be counted toward the (b)(2) account. Environmental Plaintiffs advance a

8

helpful definition of the term "primary," the ordinary meaning of which is "predominant," of "first importance," or "principal." *See Malat v. Riddell*, 383 U.S. 569, 572 (1966). Applying this definition, if an action taken under the WQCP and/or the ESA predominantly contributes to one of the primary purpose programs (e.g., fish doubling), it must be counted toward the 800,000 AF limit. Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes.

*Id.* at 46-48 (footnotes omitted).

This "primary purpose" definition was applied, resulting in a finding that Interior did not abuse its discretion in connection with two sets of actions for which water was released but not charged against the annual (b)(2) account:

From June 17 through June 24, 2004 Interior allocated 9,100 AF to Non-B2 Fishery Actions. The daily accounting for June 17 through June 30, 2004 indicates that water costs were being incurred for changes in operations at Nimbus, Clear Creek, and New Melones. (First Fujitani Decl. at ¶17.) Only those costs incurred at Nimbus and New Melones were accounted for as Non-B2 Fishery Actions. (*Id.*) A draft document entitled "Summary of (b)(2) Fish Actions for Water Year 2004," dated December 1, 2004, specifies that releases from Nimbus during the "latter part" of June were "to meet Delta demands." (AR 1521.) Mr. Fujitani states that releases from Nimbus were required to meet the June Delta outflow standard. (First Fujitani Decl. at ¶17.) Releases from New Melones were needed to meet San Joaquin River flow requirements at Vernalis. (*Id.*) Interior did not count these releases as "(b)(2)" releases, but instead as "Non-B2 Fishery Actions." (*Id.*)

The question presented is: Did either of these actions predominantly contribute to one of the (b)(2) primary purpose programs (e.g., fish doubling)? The Delta outflow standard was promulgated as part of the 1995 WQCP (D-1641). The stated purpose of the outflow standard is to protect "estuarine habitat for anadromous fishes and other estuarine-dependent species." (1995 WQCP at 15.) The Vernalis flow requirement on the San Joaquin River, along with similar flow requirement on the Sacramento River, originate in the WQCP. The stated purpose of the Vernalis flow requirements are "to provide attraction and transport flows and suitable habitat for various

9

1    life stages of aquatic organisms, including Delta smelt
     and chinook salmon."  (*Id.* at 15.)
2
     Although both of these standards are to benefit
3    anadromous fish species, they do not specifically
     identify an intent to support the fish doubling goal
4    (or any other specifically-enumerated 3406(b) program).
     In fact, the WQCP contains a wholly separate "narrative
5    objective" for salmon doubling, which provides: "Water
     quality conditions shall be maintained, together with
6    [other] measures in the watershed, sufficient to
     achieve a doubling of natural production of chinook
7    salmon from the average production of 1967-1991,
     consistent with the provisions of State and federal
8    law."  (*Id.* at 15 & 18.)  The existence of this
     separate provision, directed at anadromous fish
9    doubling, suggests that neither the Delta outflow
     objective nor the Vernalis flow requirement [was]
10   intended to achieve the CVPIA fish doubling purpose.
     Actions taken to comply with the Delta outflow
11   objective and/or the Vernalis flow requirement do not
     "predominantly" contribute to primary purpose programs.
12   Interior did not abuse its discretion in excluding
     these actions that consumed approximately 9,000 AF of
13   CVP yield from (b)(2) accounting.

14   *Id.* at 48-49 (footnotes omitted).

15

16                     III.   **EVIDENTIARY ISSUES**

17        Judicial notice was previously taken of the 1995 WQCP.  Doc.

18   711 at 51 n.18 (taking judicial notice of 1995 WQCP); Doc. 693

19   (attaching 1995 WQCP).  Plaintiffs now request that the court

20   take judicial notice  pursuant to Federal Rule of Civil Procedure

21   201(b)(2) of:

22        •    **Revised Water Rights Decision 1641 ("D-1641"), dated
                March 15, 2000. Exhibit A to Plaintiffs' First Request**
23             **for Judicial Notice ("PFRJN"), Doc. 717.**

24        •    **Amended Water Quality Control Plan for the San
                Francisco Bay/ Sacramento-San Joaquin Delta Estuary,**
25             **dated December 13, 2006.  Exhibit B to PFRJN.**

26        •    *State Water Resources Control Board Cases*, 2003 WL
                25779224, Sacramento County Superior Court.  Exhibit C
27             to PFRJN.

28

                                    10

- Department of Water Resources Bulletin 132-05, December 2006. Exhibit A to Plaintiffs' Second Request for Judicial Notice ("PSRJN"), Doc. 734.

- Goodwin Reservoir Daily Operations, June 2004. Exhibit B to PSRJN.

- Environmental Impact Report, Appendix to the 1995 WQCP (1995). Exhibit C to PSRJN.

- Final Environmental Impact Report for Implementation of the 1995 WQCP, 1999, p. 189. Exhibit D to PSRJN.

As public records the authenticity of which is not challenged, the existence of all of these documents are properly the subject of judicial notice under Federal Rule of Evidence 201. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). If the contents are disputed, the documents are not admissible for the truth of their contents. Whether these documents post-date the disputed 2004 actions is addressed below.


IV. **ANALYSIS**

A. **Summary of Plaintiffs' Request.**

Plaintiffs request reconsideration of a narrow issue: the ruling regarding the intended effect of the 1995 WQCP numeric standards as related to the WQCP's "narrative" fish doubling objective. The 9,100 AF of water Interior allocated to Non-B2 Fisheries Actions from June 17 through June 24, 2004 was used to meet the Delta outflow and Vernalis flow standards. First Decl. of Paul Fujitani, Doc. 685-4, at ¶17. These two 1995 WQCP numeric flow standards are designed, at least in part to aid fish and wildlife:

> The stated purpose of the outflow standard is to protect "estuarine habitat for anadromous fishes and other estuarine-dependent species." (1995 WQCP at 15.) The Vernalis flow requirement on the San Joaquin River,

> along with similar flow requirement on the Sacramento
> River, originate in the WQCP. The stated purpose of
> the Vernalis flow requirements are "to provide
> attraction and transport flows and suitable habitat for
> various life stages of aquatic organisms, including
> Delta smelt and chinook salmon." (*Id.* at 15.)

Doc. 711 at 50-51.

The September 19, 2008 Decision found that, because the standards "do not specifically identify an intent to support the fish doubling goal (or any other specifically-enumerated 3406(b) program)," actions taken to satisfy these standards do not "predominantly contribute to primary purpose programs." *Id*. Particular note was taken of the fact that "the WQCP contains a wholly separate 'narrative objective' for salmon doubling":

> Water quality conditions shall be maintained, together
> with [other] measures in the watershed, sufficient to
> achieve a doubling of natural production of chinook
> salmon from the average production of 1967-1991,
> consistent with the provisions of State and federal
> law.

*Id*. at 51 (citing 1995 WQCP at 15, 18). "The existence of this separate provision, directed at anadromous fish doubling, suggests that neither the Delta outflow objective nor the Vernalis flow requirement were intended to achieve the CVPIA fish doubling purpose." *Id*. at 51.

Plaintiffs maintain this interpretation of this WQCP language constitutes a "mistake in fact regarding the intended effect of the numeric standards in the WQCP." Doc. 733 at 3-4. Plaintiffs argue that the State Water Resources Control Board ("SWRCB") did indeed intend for the numeric standards (e.g., the Delta outflow and Vernalis flow standards) to implement the narrative fish doubling objective.

**B.  Is Plaintiffs' Request A Proper Motion for Reconsideration?**

The Federal Rules of Civil Procedure do not expressly provide for motions for reconsideration.  However, a motion for reconsideration may be construed as a motion to alter or amend judgment under either Rule 59(e)(motion to alter or amend judgment) or Rule 60(b)(motion for relief from judgment) if timely filed under a local rule.  *See Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 374 F.3d 857, 863 (9th Cir. 2004); *Sch. Dist. No. 1J, Multnomah County v. Acands, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).  "[A] 'motion for reconsideration' is treated as a motion to alter or amend judgment under ... Rule 59(e) if it is filed within ten days of entry of judgment."  *Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 898-99 (9th Cir. 2001) (citing *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)).  If the motion is not filed within ten days of the entry of final judgment, "it is treated as a Rule 60(b) motion for relief from a judgment or order."  *Id.* at 899.

Rule 60(b) provides six possible grounds for relief from a final judgment, order or proceeding:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

"Rule 60(b) reconsideration is generally appropriate in three instances:  (1) when there has been an intervening change of controlling law, (2) new evidence has come to light, or (3) when necessary to correct a clear error or prevent manifest injustice."  *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001) (citing *Sch. Dist. No. 1J*, 5 F.3d at 1262).

Here, Plaintiffs have moved for reconsideration under Rules 60(b)(1) and (b)(6).  Plaintiffs' motion does not satisfy the stringent requirements of Rule 60(b)(6), which is a "catch-all" provision that is used "sparingly as an equitable remedy to prevent manifest injustice."  *Lehman v. United States*, 154 F.3d 1010, 1017 (9th Cir. 1998) *(*quoting *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993)).  For Rule 60(b)(6) relief, the moving party must show "both injury and that circumstances beyond its control prevented timely action to protect its interests."  *Id.*  "Neglect or lack of diligence is not to be remedied through Rule 60(b)(6)."  *Id. (*citing *United States v. RG & B Contractors, Inc.*, 21 F.3d 952, 956 (9th Cir. 1994)).

Whether Plaintiffs' motion is properly brought under Rule 60(b)(1) requires further analysis.  Rule 60(b)(1), which applies to "mistake, inadvertence, surprise, or excusable neglect,"

14

permits a court to correct its own inadvertence, mistakes of fact, *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 350 (9th Cir. 1999), or mistakes of law, *Liberty Mut. Ins. Co. v. E.E.O.C.*, 691 F.2d 438, 440-41 (9th Cir. 1982). However, a Rule 60(b)(1) reconsideration motion should not merely present arguments previously raised, or which could have been raised in the original briefs. *See Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985) (motion properly denied where it "presented no arguments that had not already been raised in opposition to summary judgment."). "[M]otions to reconsider are not vehicles permitting the unsuccessful party to 'rehash' arguments previously presented ... Nor is a motion to reconsider justified on the basis of new evidence which could have been discovered prior to the court's ruling.... Finally, 'after thoughts' or 'shifting of ground' do not constitute an appropriate basis for reconsideration." *Westlands*, 134 F. Supp. 2d at 1130 (citing *United States v. Navarro*, 972 F. Supp. 1296, 1299 (E.D. Cal. 1997), rev'd on other grounds, 160 F.3d 1254 (9th Cir. 1998)). "These relatively restrictive standards reflect district courts' concern for preserving dwindling resources and promoting judicial efficiency." *Id.*

In prior proceedings in this case, issues raised included: (1) the purposes for which the June 17 through June 24, 2004 Non-B2 releases were made, and (2) whether those uses were primarily (as opposed to incidentally) intended to implement the (b)(2) fish doubling mandate. Plaintiffs argue that the September 19, 2008 Decision addressed an issue that was not anticipated by the prior proceedings: whether the Delta outflow

15

and Vernalis flow standards <u>were intended to contribute toward</u> <u>implementation of the 1995 WQCP's narrative fish doubling</u> <u>standard</u>.[1]

Plaintiffs acknowledge that, even if the interpretation of the SWRCB's intent is reconsidered, it still must be decided whether any such reconsideration necessitates a change in the ruling regarding whether the Bureau abused its discretion by accounting for the 9,100 AF as Non-B2 Fisheries Actions. Plaintiffs seek reconsideration because "otherwise the Court's ruling will [be] interpreted and applied to mean that actions to meet the numeric WQCP standards can never be primary purpose uses...." Doc. 773 at 4. On this limited issue, the motion for reconsideration is proper.

      C.   <u>Merits of Plaintiffs' Reconsideration Request.</u>

         1.   <u>1995 WQCP.</u>

The 1995 WQCP acknowledges that "[t]he waters of the Bay-Delta Estuary serve a multitude of beneficial uses, both within the Estuary and throughout the State. Historically, these beneficial uses have been classified under three broad categories: municipal and industrial, agricultural, and fish and

---

[1] Plaintiffs assert that the district court's interpretation of the 1995 WQCP constitutes a "mistake of fact." Defendants rejoin that a court's interpretation of the meaning of the WQCP, which operates as a legal command, is not a "mistake of fact" at all; rather, it is an interpretation of the law, from which Plaintiffs may seek relief on appeal. This is a distinction without a difference in the Ninth Circuit, which permits Rule 60(b)(1) motions to reconsider "errors of law" as well as mistakes of fact. *Liberty Mut.*, 691 F.2d at 441.

wildlife." 1995 WQCP at 11-12.

To protect these beneficial uses, the WQCP set certain numeric and narrative objectives. The WQCP included "Delta outflow objectives ... for the protection of estuarine habitat for anadromous fishes and other estuarine-dependent species,"[2] while "Sacramento and San Joaquin river flow objectives," such as the Vernalis flow standard,[3] "are included to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." *Id.* at 15. The September 19, 2008 Decision recognizes the Delta outflow and Vernalis flow standards were intended to help fish recovery.

The WQCP includes a narrative objective for salmon protection to ensure increased natural production of salmon.

> Water quality conditions shall be maintained, together with [other] measures in the watershed, sufficient to achieve a doubling of natural production of chinook salmon from the average production of 1967-1991, consistent with the provisions of State and federal law.

*Id.* at 15, 18. As to this "narrative objective":

> It is uncertain whether implementation of the numeric objectives in this plan alone will result in achieving the narrative objective for salmon protection. Therefore, in addition to the timely completion of a water rights proceeding to implement river flow and operational requirements which will help protect salmon

---

[2] In general, the Delta outflow standard, X2, fixes the location of the salinity mixing zone, the location where the average electrical conductivity in the Delta is 2.64 mmhos/cm. *See* 1995 WQCP Tables 3 and 4.

[3] The Vernalis flow objective on the San Joaquin River requires an average flow rate and a pulse/attraction flow for all water year types. 1995 WQCP at 19.

17

> migration through the Bay-Delta Estuary, other measures may be necessary to achieve the objective of doubling the natural production of chinook salmon from average 1967-1991 levels. This narrative objective is consistent with the anadromous fish doubling goals of the CVPIA; thus, prompt and efficient actions taken to implement this CVPIA goal, in concert with other recommended actions in this plan, are important to achieving the narrative salmon protection objective. Monitoring results will be considered in the ongoing review to evaluate achievement of this objective and the development of numeric objectives to replace it.

*Id.* at 28. To the extent that the September 19, 2008 Memorandum Decision suggested that the WQCP's numeric objectives do not contribute toward the narrative salmon doubling goal, it was incorrect. By expressing uncertainty whether the numeric objectives <u>alone</u> will achieve the narrative salmon doubling objective, the WQCP implies that implementation of the numeric objectives will at least <u>contribute toward</u> the narrative salmon doubling objective. Plaintiffs' motion to reconsider the ruling regarding the intended effect of the 1995 WQCP numeric standards in relation to the WQCP's "narrative" fish doubling objective is GRANTED. The WQCP indicates that "other measures" may be required to accomplish the CVPIA's anadromous fish doubling goal. That the WQCP's numeric standards may assist the implementation of the narrative fish doubling objective does not resolve whether CVP water committed to the Delta outflow and Vernalis flow requirements at any particular time is designed to "<u>predominantly contribute</u>" to one of the CVPIA primary purpose programs (e.g., anadromous fish doubling), so as to require counting water used to meet such requirements against the 800,000 AF limit.

18

## 2.   D-1641

The SWRCB issued D-1641 in December 1999.  It was amended in March 2000.  A stated purpose of D-1641 is to "recognize the San Joaquin River Agreement (SJRA) and approve, for a period of twelve years, the conduct of the Vernalis Adaptive Management Plan (VAMP) under the SJRA instead of meeting the objectives in the 1995 Bay-Delta Plan...."  D-1641 at 2.  VAMP is an experimental program designed to:

> Assess the effect of export pumping at various specific river flows.... Under the VAMP experiment, the flows at Vernalis during the April-May pulse flow period could be lower than is required by the objectives in the 1995 Bay-Delta Plan, and the export pumping rates would be lower than the pumping rates allowed in the Plan.

> ***

> The purpose of the VAMP is to gather scientific information on the relative effects on the survival and passage of salmon smolts through the Delta caused by (1) flows in the lower San Joaquin River and (2) CVP and SWP export pumping rates. (SJRGA 2, p. 3.) The study will be conducted during the April-May period when the 1995 Bay-Delta Plan calls for pulse flows in the San Joaquin River at Vernalis. Existing studies have not provided satisfactory results on the relative effects of flows and exports on smolt passage and survival. Additional studies are needed to clarify these effects (R.T. pp. 876, 883, 889.) The VAMP experiment is a unique opportunity for collecting data under controlled conditions because of the commitment of the DWR and USBR to control exports and releases from New Melones Reservoir, and operate the head of Old River barrier as needed for the experiment. As stated by the USDI, the VAMP provides a consistent framework for gathering this information. (USDI 1, p. 5)

*Id.* at 19, 21.

D-1641 indicated that, although additional measures might be needed to implement the narrative objective for salmon protection, "[a] period of actual operation meeting the numerical objectives in the 1995 Bay-Delta Plan or the measures under the

19

1  SJRA/VAMP, coupled with adequate monitoring, is required before
2  the SWRCB can determine whether additional implementation
3  measures are needed to meet this objective." *Id.* at 61.

4      This language further supports the finding, as Plaintiffs
5  assert, that the SWRCB intended for the numerical flow objectives
6  to contribute to the fish doubling objective.  This does not
7  settle the ultimate question presented by the cross motions in
8  this case:  whether the water released from June 14 through June
9  24 was released to comply with a requirement that has as its
10 predominant objective implementation of the CVPIA's fish-doubling
11 goal.

12

13      D.   2003 *SWRCB Cases* Trial Court Decision.

14      The Pacific Coast Federation of Fishermen's Associations
15 ("PCFFA") filed suit against the SWRCB in state court, arguing
16 that due to deficiencies in D-1641, the SWRCB failed to implement
17 the 1995 WQCP.  This suit was consolidated with a number of
18 other, related matters.  *See SWRCB Cases*, 2003 WL 25779224.
19 Among other things, PCFFA argued: (1) flows under the numeric
20 standards alone will not achieve salmon doubling; (2) the flows
21 under the experimental VAMP program are insufficient to achieve
22 salmon doubling and are so low as to frustrate the efforts of
23 other agencies working toward fish recovery; and (3)
24 implementation of the salmon doubling requirement was to be
25 "immediate" under the 1995 WQCP, but VAMP will proceed over a
26 twelve year period and still not achieve the objective.

27      The state court rejected these arguments, because, although
28 "[s]almon-doubling was an important objective of the 1995 Plan,"

20

the SWRCB "never relied solely on flows to achieve that goal."
Rather, the 1995 WQCP "intended that the Board act in concert
with many other responsible parties, and flows were to be one of
many curative measures."  *Id.* at *61.  The 1995 WQCP recognized
that implementation of the plan would be informed by the results
of monitoring and experiments like VAMP, and that the
salmon-doubling requirement was not an objective that "could
reasonably be met by the flow of water or by changes in the
operations of facilities."  Moreover, it is "simply unreasonable
to insist that D-1641 empirically ensure a doubling of salmon
survival rates."  Rather, "substantial evidence in the record
demonstrates that D-1641 supports and advances the narrative goal
of doubling salmon survival."  *Id.* at 78.

The trial court decision in *SWRCB Cases* corroborates the
contention that the numerical flow objectives support and advance
the narrative salmon-doubling goal, but does not resolve the
issue of whether the Delta outflow and Vernalis flow objectives
are designed to "predominantly contribute" to one of the primary
purpose programs (e.g., fish doubling).

### E.   The 2006 *SWRCB Cases* Appellate Decision & Subsequent Revision of the WQCP on Remand.

The *SWRCB Cases* decision was appealed by multiple parties.
The Court of Appeal, Third Appellate District, issued a decision
in 2006, two years after the (b)(2) accounting actions challenged
in this case.  *SWRCB Cases*, 136 Cal. App. 4th 674  (2006).  The
appellate court confirmed that the SWRCB's intent was that the
WQCP numeric standards would be used to achieve, at least in

part, the narrative objective for salmon doubling, but ruled that D-1641, did not sufficiently implement the narrative objective because it used the SJRA/VAMP program instead of the WQCP's Vernalis flow objective. *Id.* at 773-76. The issue of how to implement the WQCP's numeric flow standards to fulfill the fish doubling requirement was remanded to the SWRCB.

In response, the SWRCB amended the WQCP in 2006:

> Narrative Objective for Salmon Protection
>
> D-1641 assigned responsibility to the USBR and DWR to comply with the river flow and operational objectives for fish and wildlife. These objectives help protect salmon migration through the Bay-Delta estuary. D-1641 did not require separate actions to implement the narrative objective for salmon because the State Water Board expects that implementation of the numeric flow-dependent objectives and other non-flow measures will implement that objective.

Amended WQCP at 33.

Neither the appellate court's decision nor the 2006 Amendment to the WQCP were before the Bureau at the time of the challenged (b)(2) accounting actions in 2004. These later actions cannot be considered in a case challenging the Bureau's exercise of discretion in the 2004 (b)(2) accounting year. "Review of agency action is limited to the record considered and relied upon by the agency at the time a decision is made." *Wilderness Soc'y v. Dombeck*, 168 F.3d 367, 377 (9th Cir. 1999) (citing *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989)).

Even if the 2006 appellate court decision and subsequent amendment of the WQCP, could be considered, the result is not different. That the numerical flow objectives support and advance the 1995 WQCP's narrative salmon-doubling goal, does not

22

resolve the question of whether the Delta outflow and Vernalis
flow objectives are designed to "predominantly contribute" to one
of the CVPIA's primary purpose programs (e.g., fish doubling).

### F.    Did the Bureau Abuse Its Discretion With Respect to the June 2004 Actions?

#### 1.    Standard of Review.

This case concerns a challenge to administrative agencies'
implementation of the CVPIA.  Because the CVPIA contains no
private right of action or provision for judicial review, the
Administrative Procedure Act ("APA") governs judicial review of
agency action in this case.  5 U.S.C. §§ 701-706.  Under the APA,
federal courts can only review whether agency decisions were
"arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law."  5 U.S.C. § 706(2)(A).  "This
deferential standard is designed to ensure that the agency
considered all of the relevant factors and that its decision
contained no clear error of judgment." *Pac. Coast Fed'n of
Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001)
("*PCFFA*").  Agency action should only be overturned if the agency
has "relied on factors which Congress has not intended it to
consider, entirely failed to consider an important aspect of the
problem, [or] offered an explanation for its decision that runs
counter to the evidence before the agency, or is so implausible
that it could not be ascribed to a difference in view or the
product of agency expertise." *Nat'l Ass'n of Home Builders v.
Defenders of Wildlife*, 127 S. Ct. 2518, 2529 (2007) (quoting
*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,

23

463 U.S. 29, 43 (1983)). Essentially, a court must ask "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *PCFFA*, 265 F.3d at 1034.

As a general rule, a court must defer to the agency on matters within its expertise. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005). "Deference to the informed discretion of the responsible federal agencies is especially important, where, as here, the agency's decision involves a high level of technical expertise." *Id.* However, "[t]he deference accorded an agency's scientific or technical expertise is not unlimited." *Id.* "Deference is not owed when the agency has completely failed to address some factor consideration of which was essential to [making an] informed decision." *Id.* (internal citations and quotations omitted). Nevertheless, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Home Builders*, 127 S. Ct. at 2530.

### 2. Analysis.

The September 19, 2008 ruling found that Interior did not abuse its discretion with respect to the June Actions:

> From June 17 through June 24, 2004 Interior allocated 9,100 AF to Non-B2 Fishery Actions. The daily accounting for June 17 through June 30, 2004 indicates that water costs were being incurred for changes in operations at Nimbus, Clear Creek, and New Melones. (First Fujitani Decl. at ¶17.) Only those costs incurred at Nimbus and New Melones were accounted for as Non-B2 Fishery Actions. (*Id.*) A draft document entitled "Summary of (b)(2) Fish Actions for Water Year 2004," dated December 1, 2004, specifies that releases from Nimbus during the "latter part" of June were "to

1    meet Delta demands." (AR 1521.)  Mr. Fujitani states
     that releases from Nimbus were required to meet the
2    June Delta outflow standard.  (First Fujitani Decl. at
     ¶17.)  Releases from New Melones were needed to meet
3    San Joaquin River flow requirements at Vernalis.  (*Id.*)
     Interior did not count these releases as "(b)(2)"
4    releases, but instead as "Non-B2 Fishery Actions."
     (*Id.*)
5
     The question presented is:  Did either of these actions
6    predominantly contribute to one of the (b)(2) primary
     purpose programs (e.g., fish doubling)?  The Delta
7    outflow standard was promulgated as part of the 1995
     WQCP (D-1641).  The stated purpose of the outflow
8    standard is to protect "estuarine habitat for
     anadromous fishes and other estuarine-dependent
9    species."  (1995 WQCP at 15.)  The Vernalis flow
     requirement on the San Joaquin River, along with
10   similar flow requirement on the Sacramento River,
     originate in the WQCP.  The stated purpose of the
11   Vernalis flow requirements are "to provide attraction
     and transport flows and suitable habitat for various
12   life stages of aquatic organisms, including Delta smelt
     and chinook salmon."  (*Id.* at 15.)
13
     Although both of these standards are to benefit
14   anadromous fish species, they do not specifically
     identify an intent to support the fish doubling goal
15   (or any other specifically-enumerated 3406(b) program).
     In fact, the WQCP contains a wholly separate "narrative
16   objective" for salmon doubling, which provides: "Water
     quality conditions shall be maintained, together with
17   [other] measures in the watershed, sufficient to
     achieve a doubling of natural production of chinook
18   salmon from the average production of 1967-1991,
     consistent with the provisions of State and federal
19   law."  (*Id.* at 15 & 18.)  The existence of this
     separate provision, directed at anadromous fish
20   doubling, suggests that neither the Delta outflow
     objective nor the Vernalis flow requirement were
21   intended to achieve the CVPIA fish doubling purpose.
     Actions taken to comply with the Delta outflow
22   objective and/or the Vernalis flow requirement do not
     "predominantly" contribute to primary purpose programs.
23   Interior did not abuse its discretion in excluding
     these actions that consumed approximately 9,000 AF of
24   CVP yield from (b)(2) accounting.

25   Doc. 711 at 48-49 (footnotes omitted).  This was premised on the

26   finding that neither the Delta outflow nor Vernalis flow

27   requirements were intended to contribute toward the CVPIA's fish

28   doubling requirement.  On reconsideration, it is recognized that

25

these flow requirements were intended to <u>contribute toward</u> the

narrative fish doubling objective contained within the 1995 WQCP.

Whether the Delta outflow and Vernalis flow standards were

"predominantly" designed to implement the CVPIA's fish doubling

requirement presents a mixed question of fact and law.

   The summary judgment record contained very little specific

information pertaining to this issue.  Paul Fujitani, Chief of

the Water Operations Division in the Bureau's Central Valley

Operations Office, Doc. 685 at ¶1, declared:

> The daily accounting for (b)(2) indicates that from
> June 17, 2004 to June 30, 2004, costs were being
> accumulated due to changes in operations at Nimbus,
> Clear Creek, and New Melones.  Only costs incurred at
> Nimbus and New Melones were shown as "Non-B2 Fishery
> Actions" (AR 2565, 3184).  Costs identified as "Non-B2
> Fishery Actions" in these tables refer to water quality
> control plan actions that were not credited against the
> 2004(b)(2) account.  The changes in operations at both
> Nimbus and New Melones were required to meet water
> quality control plan objectives.  The release from
> Nimbus Reservoir assisted in meeting the June water
> quality control plan Delta outflow standard and the
> release from New Melones Reservoir was needed to meet
> San Joaquin River flow requirements at Vernalis (AR
> 2565).  Interior exercised its discretion in accordance
> with the Ninth Circuit's amended decision and refrained
> from accounting the water quality control plan costs at
> Nimbus and New Melones during the period as (b)(2)
> actions.

*Id*. at ¶17.  Mr. Fujatani does not explain the basis for the

decision not to count the Nimbus and New Melones uses against CVP

yield.

   Roger Guinee, the Water Operations Division Chief for the

United States Fish and Wildlife Service's Water and Fishery

Resources Program, Doc. 685-5 at ¶1, provides a similar

explanation:

1
2
3
4
5
6
7
8
9

       12.  From June 17, 2004 to June 30, 2004, Interior exercised its discretion under the Ninth Circuit's amended decision to refrain from accounting the WQCP costs on the American and Stanislaus rivers as (b)(2) actions, and accounted approximately 9,000 acre-feet of water used for water quality control plan actions as "Non-B2 Fishery Actions."  (AR 2565, 3182-85).  When the Service and Reclamation presented the final (b)(2) accounting for WY 2004, the Service described the portion of the upstream actions in June, 2004 that were used to meet the WQCP and not accounted as (b)(2) water.  American River flows (Nimbus releases), in "the latter part of the month releases were increased to June, 2004 assisted in meeting the WQCP's Delta outflow standard.... The Service did not recommend this flow increase to meet the primary fish, wildlife and habitat restoration purposes of CVPIA (AR 2565).

10
11
12
13
14

       13.  The Service also described the portion of the June, 2004 Stanislaus River flows used to meet WQCP and not accounted as (b)(2) water, "...(Goodwin releases) were augmented ... to help meet WQCP Vernalis flow requirements."  (AR 1521).... The Service did not recommend this flow increase to meet the primary fish, wildlife and habitat restoration purposes of CVPIA (AR 2565)

15
16
17
18
19
20
21
22
23
24

*Id.* at ¶ 13-14.  These declarations show, and Plaintiffs do not dispute, that the 9,100 AF accounted for as "Non-B2 Fisheries Actions" in late June were releases made to satisfy either the Delta outflow or Vernalis flow numeric standards contained in the 1995 WQCP, not (b)(2) anadromous fish doubling.  Neither Mr. Fujitani nor Mr. Guinee explain <u>why</u> these releases were not considered "primary (b)(2) purpose" actions, although Mr. Guinee indicates that FWS "did not recommend [these] flow increase[s] to meet the primary fish, wildlife and habitat restoration purposes of [the] CVPIA."  *Id.* at ¶¶ 13-14.

25
26
27
28

     In response to Plaintiffs' motion for reconsideration, and to support a finding that the "Non-B2 Fisheries Actions" taken under the WQCP did <u>not</u> predominantly contribute to one of the (b)(2) primary purpose programs, Environmental Plaintiffs present

27

the declaration of Christina Swanson, Ph.D., a fisheries
biologist with The Bay Institute of San Francisco.  Doc. 727.
Dr. Swanson's previous declaration was considered during the
summary judgment proceedings.  In general, Dr. Swanson opines
that, "[w]hile increased freshwater flows are generally good for
fish and for environmental conditions in the altered ecosystem of
the Delta, it does not reasonably follow that the actions needed
to comply with the water quality standards would be the same
actions one would take if the primary goal were to double salmon
populations on CVP streams."  Doc. 727 at ¶4.  Dr. Swanson
asserts that "most biologists working in the Bay-Delta system
recognize [that] the most important requirements for salmon
protection and doubling are flow standards for rivers and
tributaries upstream of the delta where salmon spawn and rear."
*Id.* at ¶5.  It is her understanding that "the relevant fishery
agencies agree with this view," citing the Final EIR for the 1995
WQCP at p. III-86 ("1995 WQCP FEIR"),  which proposes, among
other things, to establish minimum flows for CVP streams.  *Id.*

Dr. Swanson opines that the Delta outflow objective
primarily benefits non-salmonid fish species, citing portions of
the 1995 WQCP FEIR, reporting that positive correlations have
been observed between Delta outflow in spring and early summer
and abundance of white sturgeon[4], bay shrimp, *Crangon*

_____

[4]     For the purposes of the CVPIA, the term "anadromous
fish," used in § 3406(b)(1)'s anadromous fish doubling
requirement, means "those stocks of salmon (including steelhead),
striped bass, sturgeon, and American shad that ascend the
Sacramento and San Joaquin rivers and the tributaries and the
Sacramento-San Joaquin Delta to reproduce after maturing in San

*franciscorum*, longfin smelt, and Sacramento splittail.  *Id.* at ¶6

(citing 1995 WQCP FEIR at III-32, IV-15).[5]  The stated purpose of

the outflow standard is to protect "estuarine habitat for

anadromous fishes and other estuarine-dependent species."  1995

WQCP at 15.  Plaintiffs do not dispute this assertion, nor do

they point to any evidence suggesting that the particular

releases in question were likely to predominantly benefit

anadromous fish species, as opposed to the other, non-anadromous

species identified as beneficiaries of the Delta outflow standard

in the 1995 WQCP.  Absent such evidence and in light of the fact

that the 1995 WQCP FEIR indicates that the Delta outflow standard

is intended to benefit multiple species, the Bureau did not abuse

its discretion by concluding that flow releases made to satisfy

the outflow standard in late June 2004 were not required to be

counted toward the (b)(2) account.  There is a rational

correlation between the facts and Federal Defendants' decision.

---

Francisco Bay or the Pacific Ocean."  § 3403(a)(emphasis added).
The anadromous fish doubling requirement arguably encompasses
sturgeon, although no party has explicitly offered evidence
establishing that white sturgeon are within the statutory
definition.  Nevertheless, the Delta outflow standards appear to
aid several other fish species not covered by the CVPIA's
definition of anadromous, including bay shrimp, *Crangon
franciscorum*, longfin smelt, and Sacramento splittail.

> [5]    Swanson also suggests that the Delta outflow standard
is meant to protect "drinking, industrial, and irrigation water
quality."  *Id.* at ¶5 (citing 1995 WQCP FEIR at III-106).
However, even if the Delta outflow affects a variety of
beneficial uses, the State Board specifically indicated that the
justification for the Delta outflow X2 standard was "to provide
sufficient Delta outflow to protect fish and wildlife beneficial
uses in the Delta."  1995 WQCP FEIR at VI-189.

The water released in late June 2004 to comply with the Vernalis flow standard presents a closer question.  Like the Delta outflow standard, the Vernalis flow requirement is intended to serve multiple fish species by "provid[ing] attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." 1995 WQCP at 15.  Dr. Swanson suggests that, in late June 2004, the releases in question could not have benefitted salmon, as "[t]he great majority of juvenile salmon from the San Joaquin River were no longer in the river by that time and the agencies were not even sampling for juvenile salmon on the San Joaquin River at that time."  Doc. 727 at ¶9.

In response, Plaintiffs submit the Declaration of John Snow, Westlands' Deputy General Manager for Water Policy.  Doc. 732. His previous declaration was considered during the summary judgment proceedings.  Mr. Snow does not dispute the fact that "[t]he great majority of juvenile salmon from the San Joaquin River were no longer in the river by that time...."  Instead, he suggests that this is of no legal consequence because "[t]he State Water Resources Control Board ("Water Board") has stated that the purpose of the Vernalis Flow standard is 'to improve survival of salmon smolts emigrating down the San Joaquin River and to improve habitat conditions in the central and southern Delta for numerous aquatic species.'"  *Id*. at ¶7 (citing 1995 WQCP Draft EIR, at VIII-24, Exh. C).  Accepting this statement of the Board's intent, articulated in a Draft EIR, does not establish that the Vernalis flow standard predominantly aids, as opposed to merely contributes to the support of, salmonid or

other anadromous fish population covered by CVPIA § 3406(b)(1).[6]
The predominant use of water under the Vernalis standard is
disputed.

_____

[6]    Dr. Swanson suggests an alternative reason why the
water may have been released from New Melones in late June 2004.
Because the Jones Tract levee broke that year, WQCP salinity
standards in the south Delta were violated.  She recalled that
"extra releases on the Stanislaus River that year were made to
meet the Vernalis flow objectives and to minimize the salinity
violation/problem, and that these releases were not made for
salmon doubling purposes."  Specifically, she notes that the WQCP
standard for salinity at Vernalis, which is intended to protect
"agricultural and beneficial uses of water" in the Southern
Delta, *see* 1995 WQCP FEIR at VII-71, requires the 30-day average
salinity (measured as electrical conductivity, EC) to be 0.7 or
lower in June.  Doc. 727 at ¶8.  In early June 2004, according to
water quality reports, the average daily salinities at Vernalis
were increasing and exceeded 0.7 for nine consecutive days.  *Id.*
Dr. Swanson opined that "the only management response available
to the Bureau of Reclamation to avoid violating this water
quality standard was to increase releases from the Stanislaus
River, an action that was also necessary to meet the [Vernalis]
flow standard."  *Id.*
     Mr. Snow disagrees on several grounds.  For example, he
asserts there were no violations of the south Delta salinity
standard in June 2004, which is a 30-day average standard.  *Id.*
at ¶4.  In fact, the report cited by Dr. Swanson indicates the
30-day standard was not violated in June.  Doc. 732 at ¶4.  More
important is the fact that the Bureau did not subscribe to Dr.
Swanson's explanation for the releases.  The (b)(2) accounting
report for the relevant time period that indicates that
Stanislaus River releases were made to "help meet WQCP Vernalis
flow requirements."  "Although a decision of less than ideal
clarity may be upheld if the agency's path may reasonably be
discerned, [a court] cannot infer an agency's reasoning from mere
silence.  Rather, an agency's action must be upheld, if at all,
on the basis articulated by the agency itself."  *Pac. Coast Fed'n
of Fishermen's Ass'ns v. United States Bureau of Reclamation*, 426
F.3d 1082, 1091 (9th Cir.2005) (internal citations and quotations
omitted).

31

The September 19, 2008 Memorandum Decision recognized that there is "potential for overlap between the 'primary' purpose and actions taken pursuant to the fisheries purposes of the WQCP and ESA," Doc. 711 at 46, and concluded:

> [I]f an action taken under the WQCP ... predominantly contributes to one of the primary purpose programs (e.g., fish doubling), it must be counted toward the 800,000 AF limit.  Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes.

*Id.* at 48.  As to such a decision on a subject, water accounting, inherently within the agency's discretion and expertise, the deferential standard favoring the agency's decision is not overcome. Based on the totality of the information available to the Bureau at the time, including the fact that the Vernalis flow standard is designed to serve multiple purposes, not just anadromous fish doubling, coupled with the fact that there were no salmon present in the San Joaquin system in late June 2004, the Bureau exercised discretion and did not abuse it in not counting water released to comply with the Vernalis flow standard toward the (b)(2) account.  Even though the Bureau's rationale was not clearly articulated in the record, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Home Builders*, 127 S. Ct. at 2530.[7] In the future, the Agency should provide clear explanations why

---

[7] The determination of primary purpose use of CVP water for (b)(2) anadromous fish doubling is committed to the Bureau's sound discretion, to be exercised in good faith in light of chronic CVP water shortages, to achieve Congress' objectives under the CVPIA.

multi-purpose CVP water use that partially benefits anadromous fish should or should not be charged against the (b)(2) annual 800,000 AF allocation.

## V.  CONCLUSION

For these reasons, Plaintiffs' motion for reconsideration is GRANTED and the finding is made that the State Board intended for the numeric flow standards in the 1995 WQCP to contribute toward the narrative fish doubling goal in the WQCP.  This does not resolve whether water used for WQCP purposes also is predominantly used for primary CVPIA 3406(b)(2) purposes.  The September 19, 2008 ruling stands.  The disputed actions were within the Federal Defendants' discretion and expertise in managing the CVP and implementing the CVPIA.  This discretion was not abused by not charging against the (b)(2) account, CVP water released in late June 2004 to comply with the 1995 WQCP's Delta outflow and Vernalis flow requirements under the unique conditions that then existed.

Plaintiffs shall submit a form of order consistent with this Memorandum Decision within five days of electronic service.

SO ORDERED

Dated:  May 14, 2009

                    /s/ Oliver W. Wanger
                       Oliver W. Wanger
                   United States District Judge

33